# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RITA L. TRISTANI, by and through her ) 
Attorney in Fact, MARIA C. KARNES, ) 
and JOSHUA C. VALENTA, ) 
individually, and on behalf of others ) 
similarly situated, ) 
                            ) 
        **Plaintiffs,** ) 
                            ) 
        v. )       **Civil Action No. 06-694** 
                            ) 
ESTELLE B. RICHMAN, in both her ) 
individual and official capacities, and ) 
FEATHER HOUSTOUN, in her ) 
individual capacity, ) 
                            ) 
        **Defendants.** )

## MEMORANDUM OPINION

CONTI, District Judge

### *Introduction*

Pending before the court are cross-motions for summary judgment filed by Rita L. Tristani, by and through her Attorney in Fact, Maria C. Karnes, and Joshua C. Valenta, individually and on behalf of others similarly situated ("plaintiffs"), and by Estelle B. Richman, in both her individual and official capacities, and Feather Houstoun, in her individual capacity ("defendants"). This controversy concerns liens placed by the Pennsylvania Department of Public Welfare on settlement proceeds obtained from third parties by recipients of Medicaid benefits under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq*. For the reasons that follow, the motion for summary judgment filed by defendants will be granted in part and

denied without prejudice in part, and the motion for partial summary judgment filed by plaintiffs

will be denied.


## *Background*[1]

On September 14, 2001, plaintiff Rita L. Tristani ("Tristani"), by and through her attorney

in fact, Maria C. Karnes ("Karnes"), commenced a medical malpractice action in the

Pennsylvania Court of Common Pleas of Washington County against the Washington Hospital,

the Washington Family Practice Center, Jason W. Booth, M.D. ("Dr. Booth"), T. Grant Phillips,

M.D. ("Dr. Phillips"), Sarah C. Duncan, M.D. ("Dr. Duncan"), Richard A. Aprea, M.D. ("Dr.

Aprea"), and Janice M. Salansky, R.N. ("Salansky"), alleging that they had provided negligent

medical treatment to her, thereby causing her to suffer serious and permanent injuries. (Defs.'

Summ. J. App. 17A-19A.) According to Tristani, she underwent a bunionectomy in early

September 1999.[2] *(Id.* 21A.) This surgery was performed by Dr. Mark Hofbauer ("Dr.

Hofbauer"). (*Id.*) On September 28, 1999, eighteen days after her surgery, Tristani was

examined by Dr. Hofbauer. (*Id.*) During his examination, Dr. Hofbauer discovered that

Tristani's left leg had recently become painful and warm with a red, black and blue discoloration.

---

[1]The background in this part of the opinion reviews the general facts relative to the settlements reached by
the two named plaintiffs in tort actions. Other facts pertaining to a specific issue will be addressed in the part of this
opinion which discusses that issue.

[2]Although the full text of Tristani's complaint in the Pennsylvania Court of Common Pleas of Washington
County is not before the court, defendants' summary judgment appendix includes a pre-trial statement filed in that
court. (Defs.' Summ. J. App. 20A-28A.) The court considers the pre-trial statement solely for the purpose of
reciting the factual background concerning Tristani's situation. The court takes no position concerning the propriety
of the treatment provided to Tristani by the medical providers named in her lawsuit in the state trial court.

(*Id.*)  Suspecting that Tristani was suffering from deep venous thrombosis, Dr. Hofbauer immediately referred Tristani to the Washington Family Practice Center.  (*Id.*)

Later that day, Tristani was examined by Dr. Booth, who was a resident physician.  (*Id.* 22A.)  Dr. Phillips was Dr. Booth's preceptor.  (*Id.*)  Dr. Booth and Dr. Phillips allegedly performed no laboratory studies, imaging studies or diagnostic tests on Tristani, opting to rely solely on Dr. Booth's physical examination findings.  (*Id.*)  They allegedly ruled out deep venous thrombosis as the cause of Tristani's medical problem and diagnosed her as having superficial thrombophlebitis.  (*Id.* 22A-23A.)  Despite Dr. Booth's relative inexperience, Dr. Phillips did not examine Tristani himself.  (*Id.* 23A.)  Dr. Booth and Dr. Phillips indicated that Tristani should be reevaluated if her symptoms were not resolved within two to three days.  (*Id.* 24A.)  Tristani's symptoms did not resolve as expected.  (*Id.* 23A.)

On October 1, 1999, Tristani telephoned the Washington Family Practice Center to inquire about whether she should be reevaluated.  (*Id.*)  A medical assistant responded to Tristani's first telephone call by emailing Dr. Booth. (*Id.* 24A.)  Dr. Booth allegedly failed to respond to the message.  (*Id.*)  Five hours later, Dr. Apnea, another resident physician, responded with an email instructing the medical assistant to "follow up as needed."  (*Id.*)  Tristani apparently received no further communication in response to her first telephone call.  (*Id.*)  Later that day, Tristani again called the Washington Family Practice Center.  (*Id.*)  The call was answered by another medical assistant, who responded by sending an email message to Salansky, a registered nurse.  (*Id.*)  Salansky allegedly returned Tristani's telephone call, instructing her to continue to take medication which had been prescribed by Dr. Booth and Dr. Phillips and advising her that she did not need to be reevaluated.  (*Id.*)

Four days later, on October 5, 1999, Tristani suffered a massive pulmonary embolism and stroke. (*Id.* 25A.) She suffered brain damage, partial paralysis and disfigurement. (*Id.*) Because of her impairments, Tristani resides in a full-time medical care facility. (*Id.*) She is paralyzed on her right side, and uses a wheelchair to get around. (Joint Concise Statement of Material Facts, Pl.'s Facts ("J.S.P.") ¶¶ 22-23.) She needs assistance in washing, getting dressed, using the bathroom, and preparing her food. (*Id.* ¶ 23.)

On November 7, 2001, while Tristani's action was pending in the state trial court, Jessica L. Bupp ("Bupp"), a third-party liability program investigator for the Pennsylvania Department of Public Welfare ("DPW"), sent a letter to Tristani's counsel indicating that Tristani was a recipient of medical assistance under the Medicaid program, and that Pennsylvania law provided that the rights of medical assistance recipients to recover the costs of medical care from liable third parties were assigned to the DPW by operation of law. (Defs.' Summ. J. App. 1A-3A.) Tristani's counsel continued to correspond with Bupp for the next three years. (*Id.* 4A-7A.) In a letter to Tristani's counsel dated December 14, 2004, Bupp stated:

> The Department of Public Welfare maintains a lien in the amount of <u>$247,514.98</u> for the above-referenced incident.
>
> The Department has agreed to reduce its lien by <u>33.33%</u> and accept the net payment of <u>$165,018.24</u> to satisfy the total lien amount.[3]

(*Id.* 8A (underlining in original).) The "above-referenced incident" referred to in the letter was Tristani's massive pulmonary embolism and stroke on October 5, 1999. (*Id.*)

---

[3]The DPW's decision to reduce its lien by 33.33% was apparently an attempt to accommodate Tristani's contingency fee agreement with her attorneys.

Jessica L. Strawbridge ("Strawbridge"), another third-party liability program investigator, began to handle the matter on or around March 1, 2005. (*Id.* 10A.) In a letter to Strawbridge dated April 12, 2005, Tristani's counsel advised that Tristani had retained his law firm on a 40% contingency fee basis, and not on a 33.33% contingency fee basis. (*Id.* 11A.) On April 19, 2005, Strawbridge responded with a letter to Tristani's counsel which stated:

> The Department of Public Welfare maintains a lien in the amount of $247,514.98 for the above-referenced incident.

> The Department has agreed to reduce its lien by 40% and accept the net payment of $148,508.99 to satisfy the total lien amount.

*(Id.* 14A.)

A settlement was reached in Tristani's medical malpractice action on or around May 31, 2005. (J.S.P. ¶ 35.) In an order dated June 2, 2005, the state trial court acknowledged the settlement of the case for a total of $5,200,000.00. (Defs.' Summ. J. App. 35A-36A.) The order indicated that the settlement was to be paid on behalf of the Washington Hospital and Dr. Phillips, and that the claims against the Washington Family Practice Center, Dr. Booth, Dr. Duncan, Dr. Aprea and Salansky were being dismissed with prejudice. (*Id.* 36A.) The Washington Hospital and Dr. Phillips were ordered to pay $1,030,761.00 to "Pacific Life & Annuity Company" and $4,169,239.00 to "Maria C. Karnes, Attorney in Fact for Rita L. Tristani, and Loughren, Loughren & Loughren, P.C., her attorneys." (*Id.* 35A.) Beginning on June 15, 2005, Pacific Life & Annuity Services, Inc., was ordered to make monthly, tax-free payments of $3,800.00, which were to increase annually by 3%, to the Trustee of the Rita L. Tristani Irrevocable Trust. (*Id.*) These payments were to continue for the duration of Tristani's life if she were to live for more than twenty-five years, or for a minimum of twenty-five years if she were to

expire sooner. (*Id.*)  The law firm which had represented Tristani was ordered to pay, within twenty days of its receipt of the $4,169,239.00 payment, $1,847,268.59 to the "Smithfield Trust Company, Trustee of the Rita L. Tristani Irrevocable Trust," $148,508.99 to the DPW "in full and final satisfaction of its subrogation lien" against Tristani, $47,223.98 to "UFCW, Local 23 and Employers Benefit Funds" "in full and final satisfaction of its subrogation lien" against Tristani, $693,333.33 to "Amatangelo & Baisley" "in full and final satisfaction of its attorney fee," and $1,432,904.14 to itself (i.e., "Loughren, Loughren & Loughren, P.C.") "in full and final satisfaction of its attorney fee and litigation expenses." (*Id.* 36A.)  The order did not specify what portion of the settlement was attributable to Tristani's medical expenses.

On July 5, 2005, in conformity with the terms of the settlement order, Tristani's counsel sent Strawbridge a check payable to the "Pennsylvania Department of Public Welfare" in the amount of $148,508.99. (*Id.* 15A.)  In a letter sent with the check, Tristani's counsel specifically referenced Strawbridge's letter of April 19, 2005. (*Id.*)  Sharon E. Smith ("Smith"), another third-party liability program investigator, acknowledged the DPW's receipt of the $148,508.99 payment in a letter to Tristani's counsel dated July 18, 2005. (*Id.* 16A.)

Plaintiff Joshua C. Valenta ("Valenta") was injured in a multi-vehicle accident on January 29, 2005. (J.S.P. ¶ 5.)  The accident resulted in two fatalities. (*Id.* ¶ 9.)  As a result of his injuries, Valenta was hospitalized for a period of six days. (Defs.' Summ. J. App. 140A.)  He suffered multiple fractures to his right femur, and a rod was implanted into his femur during his hospital stay. (*Id.* at 104A, 141A.)  Because of the fatalities, multiple claimants were seeking recovery from the responsible third-party's liability limits of $300,000.00 per occurrence under

an insurance policy issued by State Farm Insurance Company ("State Farm"). (*Id.* 95A.) Valenta was enrolled in a medical assistance program subsequent to the accident. (J.S.P. ¶ 10.)

On April 26, 2005, DPW claims investigative agent Ara K. Danchick ("Danchick") sent Valenta's counsel a letter stating that the rights of medical assistance recipients to recover the costs of medical care from liable third parties were assigned to the DPW by operation of law. (Defs.' Summ. J. App. 84A-86A.) Margaret L. Sohn ("Sohn"), another claims investigative agent, informed Valenta's counsel by way of correspondence dated August 2, 2005, that the DPW had a lien in the amount of $15,581.56 against Valenta's "personal injury award." (*Id.* 87A-89A.) The DPW reduced the lien to $10,000.00 to account for attorneys' fees and costs. (J.S.P. ¶ 18.) In a letter to the DPW dated August 18, 2005, Valenta's counsel stated:

> Enclosed please find a check in the amount of $10,000.00, payable to Department of Public Welfare, which represents full and complete payment and final satisfaction of any and all liens pertaining to Department of Public Welfare payments made due to injuries Joshua C. Valenta sustained in the above-dated accident. The Department of Public Welfare agreed, on August 10, 2005, to accept this amount as full and complete satisfaction.

(Defs.' Summ. J. App. 90A.) The "above-dated accident" referenced in the letter was Valenta's accident of January 29, 2005. (*Id.*) In a letter to Valenta's counsel dated August 24, 2005, Sohn acknowledged the DPW's receipt of the $10,000.00 payment. (*Id.* 91A.)

On November 1, 2005, Valenta commenced an action in the Pennsylvania Court of Common Pleas of Allegheny County against Lingaraj S. Patil ("Patil") and Deondre E. Morris ("Morris"), alleging that Patil's negligence had been the cause of Valenta's injuries. (*Id.* 92A-93A.) On October 30, 2006, Patil and State Farm settled with Valenta for $70,000.00. (*Id.* 95A-96A.) Through his counsel, Valenta also pursued and recovered underinsured motorist ("UIM")

benefits.  (J.S.P. ¶ 12.)  Valenta's total gross recovery for his injuries was $130,000.00.[4]  (*Id.* ¶ 13.)

### *Procedural History*

Tristani and Valenta commenced this action against defendants Estelle B. Richman ("Richman"), Pennsylvania's Secretary of Public Welfare, Feather Houstoun ("Houstoun"), Richman's predecessor in that position, and the DPW on May 26, 2006, alleging that the DPW's liens against their recoveries had violated Title XIX of the Social Security Act, the Takings Clause of the Fifth Amendment to the United States Constitution, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and the Takings Clause of article I, section 10, of the Pennsylvania Constitution.  (Compl. (Docket No. 1) ¶¶ 108-21.)  The action was filed as a proposed class action under Federal Rule of Civil Procedure 23.  (*Id.* ¶¶ 99-106.) On June 9, 2006, Tristani and Valenta filed an amended class action complaint, naming only Richman and Houstoun as defendants.  (Am. Compl. (Docket No. 3).)[5]  Richman and Houstoun filed a motion to dismiss on September 29, 2006.  (Mot. to Dismiss (Docket No. 10).)  While the motion to dismiss was still pending, Tristani and Valenta sought leave to amend their complaint for the second time.  (Mot. to Amend (Docket No. 13).)  The court granted the request for leave to amend on October 27, 2006.  (Order of Ct. (Docket No. 16).)  Tristani and Valenta filed their

---

[4]$45,000.00 of this figure is not accounted for in the record before this court.  Valenta received $70,000.00 from his settlement with Patil and State Farm, and the record indicates that he received an additional $15,000.00 pursuant to an underinsured motorist ("UIM") policy issued through the Erie Insurance Group.  (Defs.' Summ. J. App. 97A-99A.)  In a deposition, Valenta's counsel testified that he could not recall whether Valenta had two or three UIM policies.  (*Id.* 116A.)

[5]DPW arguably was entitled to Eleventh Amendment immunity.

second amended class action complaint on November 10, 2006.  (Second Am. Compl. (Docket No. 19).)

On January 3, 2007, Richman and Houstoun filed a new motion to dismiss.  (Second Mot. to Dismiss (Docket No. 22).)  The court heard oral argument with respect to the motion to dismiss on April 17, 2007.  (Tr. of Oral Argument (Docket No. 47).)  The motion to dismiss was denied without prejudice so that the relevant factual and legal issues could be evaluated on a more developed record at the summary judgment stage.  Richman and Houstoun filed a motion for summary judgment on April 9, 2008.  (Defs.' Mot. for Summ. J. (Docket No. 64).)  Tristani and Valenta filed a motion for partial summary judgment on April 10, 2008.  (Pls.' Mot. for Partial Summ. J. (Docket No. 68).)  These motions are the subject of this memorandum opinion.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all reasonable inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated only if there is a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In determining whether a dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 249.

9

*Discussion*

**A.      The Relevant Legal Developments**

The present controversy resulted from a complicated history of legal developments

concerning the Medicaid program under the Social Security Act.  Medicaid is a complex

program.  "The system is a web; a tug at one strand pulls on every other."  *Stephenson v. Shalala*,

87 F.3d 350, 356 (9th Cir. 1996).  For this reason, the court must trace the legal developments so

that the issues raised by Tristani and Valenta can be viewed in context.

Congress appropriated funds to enable the states to provide "medical assistance" for those

"whose income and resources are insufficient to meet the costs of necessary medical services."

42 U.S.C. § 1396.  The Medicaid program involves cooperation between the states and the

federal government.  A participating state is required to comply with statutorily-prescribed

mandates involving eligibility determinations, the collection and maintenance of relevant

information, and the administration of the program.  42 U.S.C. § 1396a.  Depending on the

particular state's per capita income, the federal government pays anywhere between 50% and

83% of the costs that the state incurs for providing medical assistance to those who are eligible to

receive it.  42 U.S.C. § 1396d(b).  Because Congress provides funding for the Medicaid program,

it possesses the constitutional authority under the Spending Clause and the Necessary and Proper

Clause to attach conditions on the states' receipt of federal funds in order to "further broad policy

objectives."  *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448

U.S. 448, 474 (1980) (Burger, C.J.).

Title XIX of the Social Security Act includes many such conditions.  The relevant

portions of 42 U.S.C. § 1396a provide:

**§ 1396a.  State plans for medical assistance**

**(a) Contents.**  A State plan for medical assistance must–

        . . . .

(25) provide--

(A) that the State or local agency administering such plan will take all reasonable measures to ascertain the legal liability of third parties . . . to pay for care and services available under the plan, including--

(i) the collection of sufficient information (as specified by the Secretary in regulations) to enable the State to pursue claims against such third parties, with such information being collected at the time of any determination or redetermination of eligibility for medical assistance, and

(ii) the submission to the Secretary of a plan (subject to approval by the Secretary) for pursuing claims against such third parties, which plan shall be integrated with, and be monitored as a part of the Secretary's review of, the State's mechanized claims processing and information retrieval systems required under section 1903(r) [42 U.S.C. § 1396b®];

(B) that in any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency will seek reimbursement for such assistance to the extent of such legal liability;

        . . . .

(H) that to the extent that payment has been made under the State plan for medical assistance in any case where a third party has a legal liability to make payment for such assistance, the State has in effect laws under which, to the extent that payment has been made under the State plan for medical assistance for health care items or services furnished to an individual, the State is considered to have acquired the rights of such individual to payment by any other party for such health care items or services.

42 U.S.C. § 1396a(a)(25)(A)-(B), (H).  Other provisions of Title XIX, which are codified at 42

U.S.C. § 1396k, provide:

**§ 1396k. Assignment, enforcement, and collection of rights of payments for medical care; establishment of procedures pursuant to State plan; amounts retained by State**

(a) For the purpose of assisting in the collection of medical support payments and other payments for medical care owed to recipients of medical assistance under the State plan approved under this title [42 U.S.C. § 1396 *et seq.*], a State plan for medical assistance shall--

(1) provide that, as a condition of eligibility for medical assistance under the State plan to an individual who has the legal capacity to execute an assignment for himself, the individual is required--

(A) to assign the State any rights, of the individual or of any other person who is eligible for medical assistance under this title [42 U.S.C. § 1396 *et seq.*] and on whose behalf the individual has the legal authority to execute an assignment of such rights, to support (specified as support for the purpose of medical care by a court or administrative order) and to payment for medical care from any third party;

(B) to cooperate with the State . . . (ii) in obtaining support and payments (described in subparagraph (A)) for himself and for such person . . .; and

(C) to cooperate with the State in identifying, and providing information to assist the State in pursuing, any third party who may be liable to pay for care and services available under the plan, unless such individual has good cause for refusing to cooperate as determined by the State agency in accordance with standards prescribed by the Secretary, which standards shall take into consideration the best interests of the individuals involved . . . .

. . . .

(b) Such part of any amount collected by the State under an assignment made under the provisions of this section shall be retained by the State as is necessary to reimburse it for medical assistance payments made on behalf of an individual with respect to whom such assignment was executed (with appropriate reimbursement of the Federal Government to the extent of its participation in the financing of such medical assistance), and the remainder of such amount collected shall be paid to such individual.

42 U.S.C. § 1396k(a)(1), (b).[6]

---

[6]The applicable regulation defines the term "third party" as "any individual, entity or program that is or may be liable to pay all or part of the expenditures for medical assistance furnished under a State plan." 42 C.F.R. § 433.136(3).

While no state is required to participate in the Medicaid program, all fifty states have opted to do so. Pennsylvania carried out its federally-imposed obligation to seek reimbursement for its Medicaid expenses by enacting 62 PA. STAT. ANN. § 1409, which governs third-party liability in the Medicaid context. Section 1409(b)(1) gives the DPW the right to recover from a liable third-party tortfeasor or insurer "the reasonable value" of the medical assistance benefits provided to a Medicaid beneficiary in an action instituted and prosecuted by the state attorney general of Pennsylvania in the name of either the DPW or the injured medical assistance recipient. 62 PA. STAT. ANN. § 1409(b)(1). An action brought on behalf of the DPW in accordance with section 1409(b)(1) does not bar an action brought by the Medicaid beneficiary against the liable tortfeasor or insurer, nor does it deny him or her the portion of a recovery not subject to the DPW's claim for reimbursement. 62 PA. STAT. ANN. § 1409(b)(3).

In addition to the provisions governing an action by the DPW against a liable third-party tortfeasor or insurer, Pennsylvania law provides for the reimbursement of the DPW for the cost of medical assistance benefits out of the proceeds of a Medicaid recipient's judgment, award or settlement in a suit or claim against a liable third-party tortfeasor or insurer. 62 PA. STAT. ANN. § 1409(b)(7). Prior to July 7, 2005, section 1409(b)(7) provided:

**§ 1409.  Third party liability**

. . . .

(7) In the event of judgment or award in a suit or claim against such third party or insurer:

(i) If the action or claim is prosecuted by the beneficiary alone, the court or agency shall first order paid from any judgment or award the reasonable litigation expenses, as determined by the court, incurred in preparation and prosecution of such action or claim, together with reasonable attorney's fees, when an attorney

has been retained. After payment of such expenses and attorney's fees the court or agency shall, on the application of the department, allow as a first lien against the amount of such judgment or award, the amount of the department's expenditures for the benefit of the beneficiary under the medical assistance program, as provided in subsection (d).

(ii) If the action or claim is prosecution [sic] both by the beneficiary and the department, the court or agency shall first order paid from any judgment or award, the reasonable litigation expenses incurred in preparation and prosecution of such action or claim, together with reasonable attorney's fees based solely on the services rendered for the benefit of the beneficiary. After payment of such expenses and attorney's fees, the court or agency shall apply out of the balance of such judgment or award an amount of benefits paid on behalf of the beneficiary under the medical assistance program.

62 PA. STAT. ANN. § 1409(b)(7).[7]

The DPW instituted a managed care program on February 7, 1997. (J.S.P. ¶ 56.) Under this program, the DPW contracts with managed care organizations ("MCOs"), which are private entities, to provide medical assistance services to Medicaid recipients on a capitated basis. (*Id.* ¶ 57.) Pursuant to this arrangement, an MCO provides medical assistance to a particular recipient in exchange for a monthly fee paid to it by the DPW. (*Id.* ¶ 59.) The DPW pays the capitation fees for all individuals enrolled in MCOs at the beginning of each month. (*Id.* ¶ 60.) The monthly capitation fee is the only money that the DPW spends on a medical assistance recipient who is enrolled in an MCO. (*Id.* ¶ 61.) Enrollment in an MCO is mandatory for recipients in

---

[7]The reference to "subsection (d)" in section 1409(b)(7)(i) apparently resulted from an oversight by the Pennsylvania Legislature. Section 1409 does not contain a "subsection (d)." In *Department of Public Welfare v. Tetrault*, 822 A.2d 862, 865 n.3 (Pa. Commw. Ct. 2003), the Pennsylvania Commonwealth Court observed that the language of section 1409(b)(7)(i) was the same as that found in a California statute, and that the Pennsylvania legislature must have used that language without realizing that the reference to "subsection (d)" should have been omitted from the Pennsylvania statute. The court notes that on July 7, 2005, when section 1409 was amended, this mistaken reference to "subsection (d)" was deleted from the statutory text. 2005 Pa. Laws 190.

twenty-five Pennsylvania counties and voluntary for recipients in twenty-seven Pennsylvania counties.  (*Id.* ¶ 63.)

On January 31, 2005, the Pennsylvania Superior Court decided *In re C.S.*, No. 83 WDA 2004 (Pa. Super. Ct. Jan. 31, 2005).  (Docket No. 28 at 1-8.)  In that unpublished decision, the superior court construed the phrase "the amount of the department's expenditures for the benefit of the beneficiary under the medical assistance program," as it appeared in section 1409(b)(7)(i), to refer only to the amount of the capitation fees paid by the DPW to an MCO for the benefit of the particular medical assistance recipient at issue.  (*Id.* at 6-7.)  The superior court reasoned that the DPW would obtain a windfall if it were able to recover the medical expenses incurred by the MCO in providing medical assistance to the recipient because the only expenses incurred by the DPW for that recipient's benefit had been the capitation fees paid to the MCO.  (*Id.* at 7.)

Rule 65.37(A) of the superior court's internal operating procedures provides:

An unpublished memorandum decision shall not be relied upon or cited by a Court or a party in any other action or proceeding, except that such a memorandum decision may be relied upon or cited (1) when it is relevant under the doctrine of law of the case, res judicata, or collateral estoppel, and (2) when the memorandum is relevant to a criminal action or proceeding because it recites issues raised and reasons for a decision affecting the same defendant in a prior action or proceeding.  When an unpublished memorandum is relied upon pursuant to this rule, a copy of the memorandum must be furnished to the other party [and] to the Court.

210 PA. CODE § 65.37(A).[8]  By its very terms, rule 65.37(A) permits a party to rely on an

unpublished decision of the Superior Court for purposes of res judicata and collateral estoppel.

In *Liberto v. Suburban General Hospital*, GD No. 02-020275 (Pa. Ct. Com. Pl. Allegheny

County  June 23, 2005), the Pennsylvania Court of Common Pleas of Allegheny County held that

the DPW was collaterally estopped from arguing that section 1409(b)(7)(i) permitted the DPW to

recover the expenses incurred by an MCO in providing medical assistance to a Medicaid

recipient, since the superior court had already held, in *In re C.S.*, that section 1409(b)(7)(i)

provided only for the recovery of the capitation fees paid to an MCO by the DPW for the

treatment of a recipient enrolled in an MCO.  (Docket No. 71-2 at 2-5.)  In so holding, the state

trial court relied on language in *Mellon Bank v. Rafsky*, 535 A.2d 1090, 1093 (Pa. Super. Ct.

1987), declaring that "[c]ollateral estoppel may be used as either a sword or a shield by a stranger

to the prior action if the party against whom the doctrine is invoked was a party or in privity with

a party to the prior action."  (*Id.* at 3.)  The state trial court reasoned that since the DPW had been

a party in *In re C.S.*, the medical assistance recipient at issue in *Liberto* could use the superior

---

[8]By virtue of 28 U.S.C. § 1738, this court must give the superior court's decision in *In re C.S.* the same preclusive effect that it would be accorded by a Pennsylvania court.  "This statute has long been understood to encompass the doctrines of res judicata, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'" *San Remo Hotel, L.P. v. County of San Francisco*, 545 U.S. 323, 336 (2005).  It does not follow, however, that this court cannot cite *In re C.S.* for purposes other than those permitted under rule 65.37(A) of the superior court's internal operating procedures.  In exercising supplemental jurisdiction or diversity-of-citizenship jurisdiction over a state claim, a federal court has an obligation to ascertain the meaning of the applicable state's law.  In so doing, a federal court may need to look beyond the published decisions of the particular state's tribunals.  Regardless whether a particular decision is ultimately published, the tribunal which issues that decision has an obligation to rule in accordance with the law, since the litigants at issue in an unpublished decision are no less entitled to equal and proper treatment under the law than are the litigants at issue in a published decision.  Unpublished decisions often provide insight about the state of the law, and may be treated "with great care and respect." *Alshrafi v. American Airlines, Inc.*, 321 F.Supp.2d 150, 159, n.9 (D. Mass. 2004).  This court has discretion to consider the rationale of an unpublished decision of the superior court when doing so assists the court's task in correctly ascertaining and applying the law of Pennsylvania.

court's decision in that case as a "sword" with respect to the construction of section 1409(b)(7)(i).  (*Id.* at 2-4.)

Apparently displeased with the superior court's decision in *In re C.S.*, the Pennsylvania legislature on July 7, 2005, amended § 1409(b)(7).  2005 Pa. Laws 190.  The word "settlement" was added to the prefatory language contained in section 1409(b)(7) to clarify that the provision was applicable to a "settlement" as well as to a "judgment" or an "award."  *Id.*  In addition, the following language was added to section 1409(b)(7):

> (iii) With respect to claims against third parties for the cost of medical assistance services delivered through a managed care organization contract, the department shall recover the actual payment to the hospital or other medical provider for the service.  If no specific payment is identified by the managed care organization for the service, the department shall recover its fee schedule amount for the service.

62 Pa. Stat. Ann. § 1409(b)(7)(iii).  The effect of this statutory amendment was to reverse the decision in *In re C.S.*, thereby allowing the DPW to recover from liable third-party tortfeasors and insurers the costs incurred by MCOs in providing medical assistance to Medicaid recipients.

The next major legal development relevant to this case occurred on May 1, 2006, when the United States Supreme Court decided *Arkansas Department of Health and Human Services v. Ahlborn*, 547 U.S. 268 (2006).  At issue in *Ahlborn* was an Arkansas statute providing that where a Medicaid recipient obtained a tort settlement after the payment of medical costs on his or her behalf by Medicaid, a lien was to be placed on the settlement proceeds in an amount equal to Medicaid's costs.  *Id.* at 272.  The amount of the lien was tied to the costs incurred by the Medicaid program rather than to the portion of the settlement proceeds attributable to medical costs.  *Id.*  Consequently, where the amount of Medicaid's expenditures on behalf of a recipient exceeded the portion of the recipient's settlement proceeds attributable to medical costs,

satisfaction of the state's lien required payment out of settlement proceeds attributable to damages other than medical costs, such as damages for pain and suffering, lost wages, or loss of future earnings.[9]  *Id.*  The question presented in *Ahlborn* was whether the enforcement of that lien was consistent with federal law.

In a unanimous decision, the Supreme Court construed the phrase "payment by any other party *for such health care items or services*" appearing in § 1396a(a)(25)(H), and the phrase "payment *for medical care* from any third party" appearing in § 1396k(a)(1)(A), to mean that federal law *required* a state to recoup only the portion of a Medicaid recipient's settlement that was attributable to *medical* expenses.  *Id.* at 280-82.  The Supreme Court explained that Title XIX contained other provisions which expressly *limited* a state's authority to recover expenses incurred for the benefit of a Medicaid recipient, thereby precluding a determination that Title XIX merely "supplied a recovery 'floor' upon which States were free to build."  *Id.* at 283.  The provisions to which the Supreme Court referred are codified at 42 U.S.C. §§ 1396a(a)(18) and 1396p(a)-(b).

Under § 1396a(a)(18), "[a] State plan for medical assistance must . . . comply with [§ 1396p] with respect to liens, adjustments and recoveries of medical assistance correctly paid . . . ."  42 U.S.C. § 1396a(a)(18).  The relevant portions of § 1396p provide:

---

[9]In *Ahlborn*, 547 at 277 n.6, the Supreme Court noted that the Arkansas law at issue provided the Arkansas Department of Health and Human Services ("ADHHS") with a right to recover medical costs that was broader than that enjoyed by the medical assistance recipient.  The Arkansas statute at issue provided that no contributory or comparative fault on the part of the recipient could be attributed to the ADHHS.  *Id.*  The court notes that Pennsylvania's statute implementing the Medicaid program had been construed in a similar manner.  In *Department of Public Welfare v. Tetruth*, 822 A.2d 862, 863-67 (Pa. Commw. Ct. 2003), the Pennsylvania Commonwealth Court construed sections 1409(b)(1) and 1409(b)(7)(i) to mean that the DPW was entitled to recover its expenditures without a reduction in proportion with the recipient's comparative negligence.  The commonwealth court observed that under section 1409(b)(11), the DPW's claim could not exceed one-half of the recipient's recovery after deductions for attorneys' fees, litigation costs, and medical expenses relating to the injury paid for by the recipient.  *Id.* at 865.

**§ 1396p.  Liens, adjustments and recoveries, and transfers of assets**

**(a) Imposition of lien against the property of an individual on account of medical assistance rendered to him under a State plan.**

(1) No lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan, except--

(A) pursuant to the judgment of a court on account of benefits incorrectly paid on behalf of such individual, or [in circumstances not relevant to this case].

. . . .

**(b) Adjustment or recovery of medical assistance correctly paid under a State plan.**

(1) No adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan may be made, except [in circumstances not relevant to this case].

42 U.S.C. § 1396p(a)-(b).  In *Ahlborn*, the Supreme Court observed that the anti-lien provision contained in § 1396p(a)(1), "[r]ead literally and in isolation," would appear to preclude a lien even on the portion of a recipient's settlement proceeds attributable to payments for medical care. *Ahlborn*, 547 U.S. at 284.  The Medicaid recipient at issue in that case, however, did not argue that the anti-lien provision precluded the encumbrance of the portion of her settlement proceeds attributable to medical expenses.  *Id.* ("Ahlborn does not ask us to go so far, though; she assumes that the State's lien is consistent with federal law insofar as it encumbers proceeds designated as payments for medical care.").  Instead, she argued only that the anti-lien provision precluded the Arkansas Department of Health and Human Services ("ADHHS") from attaching or encumbering the remainder of her settlement proceeds.  *Id.*  The Supreme Court found this argument to be persuasive.

At the outset, it was noted in *Ahlborn* that §§ 1396a(a)(25) and 1396k(a) expressly provided Arkansas with the authority to require a Medicaid recipient to assign his or her right, or chose in action, to receive payments for medical care. *Id.* The Supreme Court also *assumed*, as did the parties in the case, that Arkansas could also "demand as a condition of Medicaid eligibility that the recipient 'assign' in advance any payments that may constitute reimbursement for medical costs." *Id.* Proceeding on the assumption that it was authorized by §§ 1396a(a)(25) and 1396k(a), the Supreme Court treated this "forced assignment" as an exception to § 1396p(a)(1). *Id.* ("*To the extent* that the forced assignment is expressly authorized by the terms of §§ 1396a(a)(25) and 1396k(a), it is an exception to the anti-lien provision.") (emphasis added). The Supreme Court held that the "exception carved out by §§ 1396a(a)(25) and 1396k(a) [was] limited to payments for medical care," and that § 1396p(a)(1) prohibited Arkansas from placing a lien on any portion of a Medicaid recipient's settlement award which was not attributable to medical expenses. *Id.* at 284-85.

The language used in *Ahlborn* shows that the Supreme Court *assumed* that §§ 1396a(a)(25) and 1396k(a) created an exception to § 1396p(a)(1). *Id.* at 291-92 ("That does not mean, however, that Congress meant to authorize States to seek reimbursement from Medicaid recipients themselves; in fact, with the *possible* exception of a lien on payments for medical care, the statute expressly prohibits liens against the property of Medicaid beneficiaries.") (emphasis added). Consequently, whether a state can place a lien on the portion of a Medicaid recipient's settlement proceeds attributable to payments for medical care remains an open question. *McMillian v. Stroud*, 83 Cal. Rptr. 3d 261, 272-73 (Cal. Ct. App. 2008) (recognizing that the Supreme Court, in *Ahlborn*, did not determine whether a state could impose a lien on the portion

of a Medicaid recipient's settlement proceeds attributable to payments for medical care).

*Ahlborn's* holding is that a state cannot place a lien on portions of a recipient's settlement proceeds attributable to other forms of damages, such as pain and suffering, lost wages, or loss of future earnings. The applicability of the anti-recovery provision contained in § 1396p(b)(1) in the context of liens imposed on payments for medical care remains an open question. The parties in *Ahlborn* did not raise that issue, and the Supreme Court stated in a footnote that it would "leave for another day the question of [§ 1396p(b)(1)'s] impact on the analysis." *Ahlborn*, 547 U.S. at 284 n.13.

On July 4, 2008, the Pennsylvania legislature enacted legislation in order to bring Pennsylvania's administration of the Medicaid program into conformity with the Supreme Court's decision in *Ahlborn*. 2008 Pa. Legis. Serv. 279 (West). This statutory amendment is codified in 62 PA. STAT. ANN. § 1409.1, which provides:

**Section 1409.1. Federal Law Recovery of Medical Assistance Reimbursement**

(a) To the extent that Federal law limits the department's recovery of medical assistance reimbursement to the medical portion of a beneficiary's judgment, award or settlement in a claim against a third party, the provisions of this section shall apply.

(b) In the event of judgment, award or settlement in a suit or claim against a third party or insurer:

(1) If the action or claim is prosecuted by the beneficiary alone, the court or agency shall first order paid from any judgment or award the reasonable litigation expenses, as determined by the court, incurred in preparation and prosecution of the action or claim, together with reasonable attorney fees. After payment of the expenses and attorney fees, the court or agency shall allocate the judgment or award between the medical portion and other damages and shall allow the department a first lien against the medical portion of the judgment or award, the

21

amount of the expenditures for the benefit of the beneficiary under the medical assistance program.

(2) If the action or claim is prosecuted both by the beneficiary and the department, the court or agency shall first order paid from any judgment or award the reasonable litigation expenses incurred in preparation and prosecution of the action or claim, together with reasonable attorney fees based solely on the services rendered for the benefit of the beneficiary. After payment of the expenses and attorney fees, the court or agency shall allocate the judgment or award between the medical portion and other damages and shall make an award to the department out of the medical portion of the judgment or award the amount of benefits paid on behalf of the beneficiary under the medical assistance program.

(3) The department shall be given reasonable advance notice before the court makes any allocation of a judgment or award under this section.

(4) The provisions of section 1409(b)(7)(iii) shall apply to this section.

62 PA. STAT. ANN. § 1409.1. Section 1409(b)(7)(iii), which is specifically referenced in section

1409.1(b)(4), is the provision that was designed to reverse the effects of the superior court's

decision in *In re C.S.*

The new legislation also established a mechanism designed to enable medical assistance

recipients to pursue liable third parties without seeking compensation for medical expenses

incurred by the Medicaid program. This mechanism is codified at 62 PA. STAT. ANN. §

1409(b)(5), which provides:

(5) If either the beneficiary or the department brings an action or claim against such third party or insurer, the beneficiary or the department shall within thirty days of filing the action give to the other written notice by personal service, or by certified or registered mail of the action or claim. Any third party or insurer that has received information indicating that the beneficiary received benefits under the medical assistance program shall give written notice to the department by personal service or by certified or registered mail of the action or claim. Proof of the notices shall be filed in the action or claim.

(i) If a beneficiary files an action or claim that does not seek recovery of expenses for which benefits under the medical assistance program are provided, the

beneficiary shall include in the notice to the department a statement that the action or claim does not seek recovery of the expenses.

(ii) If a parent files an action or claim that does not seek recovery of a minor's medical expenses paid by the medical assistance program, the parent shall include in the notice to the department a statement that the action or claim does not seek the recovery of the expenses.

(iii) If a beneficiary files an action or claim that seeks the recovery of expenses for which benefits under the medical assistance program are provided and later elects not to seek recovery of the expenses, the beneficiary shall provide reasonable notice to the department by personal service or by certified or registered mail. Notice shall be reasonable if it allows the department sufficient time to petition to intervene in the action and prosecute its claim.

(iv) Notice of any settlement shall be provided to the department by the beneficiary and any third party or insurer within thirty days of the settlement. Where judicial approval of the settlement is required, reasonable notice of the settlement shall be provided to the department before a judicial hearing for approval of the settlement. Notice is reasonable if it allows the department sufficient time to intervene in the action and prosecute its claim.

(v) If an action or claim is brought by either the department or beneficiary, the other may, at any time before trial on the facts, become a party to or shall consolidate his action or claim with the other if brought independently.

(vi) The beneficiary may include as part of his claim the amount of benefits that have been or will be provided by the medical assistance program.

62 PA. STAT. ANN. § 1409(b)(5)(i)-(vi). In light of these statutory revisions, it is clear that Medicaid recipients in Pennsylvania now have two options when they pursue recoveries from liable tortfeasors or insurers. They can either pursue a comprehensive award, which will be subject to the DPW's lien up to the amount permitted under *Ahlborn*, or pursue an award corresponding only with their unassigned rights to recover damages not attributable to payments made by the Medicaid program for medical assistance, which will be free of any liens or encumbrances related to money owed to the DPW.

The pending motions for summary judgment present a plethora of issues to be resolved. Richman and Houstoun move for summary judgment with respect to all the claims asserted by Tristani and Valenta. (Defs.' Mot. for Summ. J.) Tristani and Valenta move with respect to the issue of liability for summary judgment with respect to all claims. (Docket No. 69 at 49.) Thus, Tristani and Valenta implicitly concede that even if liability is established as a matter of law, the amount of damages will need to be determined by a trier of fact.

## B.     Res Judicata and Collateral Estoppel

The Full Faith and Credit Clause of the United States Constitution incorporates the doctrines of res judicata and collateral estoppel. *Riley v. New York Trust Co.*, 315 U.S. 343, 349 (1942). That constitutional provision, however, refers only to limitations on "each State." U.S. CONST. art. IV, § 1. The Constitution does not require a federal court to honor the res judicata or collateral estoppel effects of a judgment rendered by a state court. When a judgment is rendered by a state tribunal, federal courts, however, are statutorily bound by the doctrines of res judicata and collateral estoppel under 28 U.S.C. § 1738, which provides:

> **§ 1738.  State and Territorial statutes and judicial proceedings; full faith and credit**
>
> The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.
>
> The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.
>
> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States

and its Territories and Possessions as they have by law or usage in the courts of
such State, Territory or Possession from which they are taken.

28 U.S.C. § 1738; *see Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 483 n.24 (1982). "This

statute has long been understood to encompass the doctrines of res judicata, or 'claim

preclusion,' and collateral estoppel, or 'issue preclusion.'" *San Remo Hotel, L.P. v. City &*

*County of San Francisco*, 545 U.S. 323, 336 (2005). A federal court must give a judgment

rendered by a state court the same preclusive effect that it would be accorded by another state

tribunal. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005).

Richman and Houstoun contend that Tristani's action against them is barred by the

doctrine of res judicata.[10] Their argument rests on the premise that the settlement order issued by

the Pennsylvania Court of Common Pleas of Washington County, which allocated $148,508.99

for the payment of the DPW's lien, precludes Tristani from litigating her claims arising out of

that payment. (Docket No. 65 at 17-18.) Tristani argues that Richman and Houstoun cannot rely

on the doctrine of res judicata, since they were not parties to the prior action. In order to resolve

this dispute, the court turns to Pennsylvania law.

In *Balent v. City of Wilkes-Barre*, 669 A.2d 309 (Pa. 1995), the Pennsylvania Supreme

Court recognized:

> *Res judicata*, or claim preclusion, is a doctrine by which a former adjudication
> bars a later action on all or part of the claim which was the subject of the first
> action. Any final, valid judgment on the merits by a court of competent
> jurisdiction precludes any future suit between the parties or their privies on the
> same cause of action. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). *Res judicata*

---

[10]The argument advanced by Richman and Houstoun is based upon ordinary principles of claim preclusion,
not on principles of subject-matter jurisdiction. Under the circumstances of this case, it is clear that the order of the
Pennsylvania Court of Common Pleas of Washington County approving the settlement agreement in Tristani's case
does not deprive this court of subject-matter jurisdiction. *See Turner v. Crawford Square Apartments III, L.P.*, 449
F.3d 542, 547-48 (3d Cir. 2006).

> applies not only to claims actually litigated, but also to claims which could have
> been litigated during the first proceeding if they were part of the same cause of
> action. *Id.*

*Balent*, 669 A.2d at 313. As this passage clearly states, those in privity with a party to an action

can be bound by an adjudication to the same extent as the parties to that adjudication. Two

actions are based on the same "cause of action" when it can fairly be said that "the primary right

and duty, and delict or wrong, are the same in each action." *Dempsey v. Cessna Aircraft Co.*, 653

A.2d 679, 681 (Pa. Super. Ct. 1995) (en banc). Whether two actions involve the same "cause of

action" depends upon whether the factual allegations in both actions are the same, whether the

same evidence is necessary to prove the allegations in both actions, and whether both actions

seek compensation for the same damages. *Kelly v. Kelly*, 887 A.2d 788, 792 (Pa. Super. Ct.

2005). A lack of identity of these facets between two actions supports a conclusion that the

actions are not based on the same cause of action. *Turner v. Crawford Square Apartments III,*

*L.P.*, 449 F.3d 542, 549 (3d Cir. 2006). The applicability of res judicata turns not on whether the

two actions in question are based upon similar legal theories, but rather on whether there is a

"similarity of the underlying events giving rise to [the] various legal claims" at issue. *In re Jones*

*& Laughlin Steel Corp.*, 477 A.2d 527, 531 (Pa. Super. Ct. 1984).

The settlement order issued by the state trial court in Tristani's medical malpractice case

has res judicata effect with respect to her claims against the third parties responsible for her

injuries. *See Pennsylvania Human Relations Comm'n v. Graybill*, 393 A.2d 420, 421-23 (Pa.

1978) ("A consent decree has a Res judicata effect, binding the parties with the same force and

effect as a final decree rendered after a full hearing upon the merits."). What effect, if any, the

settlement order has on Tristani's claims against Richman and Houstoun is a different question.

26

It is undisputed that the DPW did not intervene in Tristani's action against the liable third parties. (J.S.P. ¶ 42.) Relying on the Pennsylvania Supreme Court's decision in *American Surety Company of New York v. Dickson*, 28 A.2d 316, 319 (Pa. 1942), Richman and Houstoun argue that the settlement order precludes Tristani from litigating her claims against them. Under *Dickson*, if the DPW imposed a lien on Tristani's settlement proceeds, it would be precluded from pursuing the third parties responsible for Tristani's injuries in a direct action to recover the costs of medical assistance provided in response to those injuries. *Dickson*, 28 A.2d at 319. *Dickson*, however, does not address the precise issue presented in this case. The argument advanced by Richman and Houstoun would be stronger if Tristani's action in the state trial court had been an action *in rem*. *See Venture Eng'g, Inc. v. Tishman Constr. Corp. of S.C.*, 600 S.E.2d 547, 550 (S.C. Ct. App. 2004). Tristani's action against the health care providers responsible for her injuries, however, was an action *in personam*.

None of the decisions relied upon by the parties in this case are on point. The court did not find any decision applying Pennsylvania's res judicata principles to factual circumstances comparable to those in this case. One decision was found which applied the law of New York. In *Green v. City of New York*, 438 F. Supp. 2d 111 (E.D.N.Y. 2006), the district court applied New York's res judicata principles to a virtually indistinguishable series of facts. In *Green*, recipients of medical assistance under Title XIX (and the parents of those recipients) had obtained court-approved settlements from liable third parties. *Green*, 438 F. Supp. 2d at 117-18. The City of New York Department of Social Services Human Resources Administration ("HRA") had imposed liens on the recipients' settlement proceeds in order to recoup the costs of services provided under Medicaid, prompting the recipients to make payments to the HRA in

order to satisfy the liens. *Id.* Believing that the HRA had improperly inflated the amounts of the liens in order to recover the costs of services that were supposed to be provided free of charge under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, the recipients commenced an action seeking both the return of the settlement proceeds that had been wrongfully collected by the HRA and an order enjoining the HRA, the Commissioner of the HRA and the City of New York from attempting to seek reimbursement for IDEA-related expenses in the future. *Id.* at 115-18. The defendants raised the defense of res judicata, but the district court determined that the plaintiffs' claims were not barred due to the lack of privity. *Id.* at 121-22. The district court explained:

> The instant matter is not barred by claim preclusion because there is no privity between the parties. Defendants City of New York, HRA, and Commissioner Eggleston were not parties to the personal injury actions as to which the state court settlements were approved. Nor are there allegations that the defendants controlled any parties to the state court personal injury actions. The defendants' interests were not represented by the doctors and hospitals sued by the plaintiffs in their personal injury actions. Indeed, as the interests of the defendant hospitals and doctors undoubtedly would be to avoid liability altogether or settle for as little as possible, such interests would be adverse to the City of New York and HRA's interest in satisfying the liens.

*Id.* The district court held that the plaintiffs' claims for the recovery of proceeds which had been wrongfully collected by the HRA were "sufficiently separate" from the underlying personal injury actions to defeat the defendants' res judicata defense. *Id.* at 122. This court finds the rationale of Green to be persuasive.

In various contexts, Pennsylvania courts have recognized that decisions issued by courts in other states can be helpful in ascertaining the applicable law in Pennsylvania. *Commonwealth v. Edmonds*, 586 A.2d 887, 895, 899-901 (Pa. 1991) (attorneys may discuss relevant precedents

from other jurisdictions when briefing the construction of analogous provisions of the Pennsylvania Constitution's Declaration of Rights); *Sabad v. Fessenden*, 825 A.2d 682, 695-97 (Pa. Super. Ct. 2003). The court here concludes that the Pennsylvania Supreme Court would follow the rationale in *Green* if it were presented with this issue. With respect to the matters relevant to the issue of res judicata, the factual circumstances presented in *Green* were similar to those presented in this case. Here, like in *Green*, there are no allegations that defendants controlled any party to the state court tort action. Defendants in this case, were not represented by the parties sued in those actions and those parties' interest in awarding liability were adverse to defendants' interests. The court holds that Richman and Houstoun were not in privity with the defendants in the state court tort actions and this action is not barred by the doctrine of res judicata. Section 1738 does not preclude this court from reaching the merits of Tristani's claims.

As noted earlier, section 1738 incorporates not only the doctrine of res judicata, but also the related doctrine of collateral estoppel. *San Remo Hotel, L.P.*, 545 U.S. at 336. Tristani and Valenta contend that the superior court's decision in *In re C.S.* correctly stated the applicable law in Pennsylvania prior to the enactment of section 1409(b)(7)(iii) on July 7, 2005. Richman and Houstoun argued that the rationale of *In re C.S.* must be discredited on the ground that it was an unpublished decision. Regardless whether the decision was "correct," this court recognizes that would not be treated as precedential by a Pennsylvania court. *Turner*, 449 F.3d at 548. The court, however, may consider that decision for any insight it provide. *See supra* note 8.

In *Liberto*, the state trial court concluded that the DPW was collaterally estopped from asserting a claim for reimbursement for the amount of money spent by an MCO to provide medical assistance to a Medicaid recipient. (Docket No. 71-2 at 2-4.) If the decision in *Liberto*

was correct with respect to the issue of collateral estoppel, the DPW is precluded from arguing

that Pennsylvania law allowed it to recoup an MCOs' expenditures before the enactment of

section 1409(b)(7)(iii). Richman and Houstoun contend that the state trial court's decision in

*Liberto* was in error, and that collateral estoppel cannot be asserted against a governmental entity.

They identified no decision of a Pennsylvania court that supports their position. *Id.* They urge

the court to predict that the Pennsylvania Supreme Court, if presented with this question, would

adopt for Pennsylvania a rule similar to that adopted for the federal government by the United

States Supreme Court in *United States v. Mendoza*, 464 U.S. 154 (1984).

In *Mendoza*, the Supreme Court held that litigants who were not parties to a prior action

cannot avail themselves of offensive collateral estoppel against the federal government.[11]

*Mendoza*, 464 U.S. at 155-64. The Supreme Court reasoned that if one individual could employ

another individual's adjudication against the federal government as a "sword" in future litigation,

the federal government would be forced to appeal every adverse judgment, regardless whether it

was economically beneficial to do so, in order to avoid the collateral estoppel effects of an

adverse judgment in later cases. *Id.* at 162-63. Although it was acknowledged that the federal

government was bound by the res judicata effects of any prior adverse judgments with respect to

subsequent litigation involving parties to the prior adjudications, it was determined that the

federal government's unique status as an uncommonly frequent party to litigation warranted the

conclusion that nonparties to the prior adjudications could not use the doctrine of offensive

collateral estoppel as a "sword" against the federal government. *Id.* at 162-64.

---

[11]Although not relevant to the circumstances of this case, it is worth noting that a similar rule would most likely prevent a nonparty to a prior adjudication from invoking defensive collateral estoppel against the federal government. *Reich v. D.C. Wiring, Inc.*, 940 F. Supp. 105, 107-08 (D.N.J. 1996).

The Supreme Court's decision in *Mendoza* was based on uniquely federal concerns. For instance, the Supreme Court noted that it usually waited for a conflict among the federal courts of appeals to develop before granting a petition for certiorari filed by the federal government. *Id.* at 160. This practice fostered the "thorough development of legal doctrine by allowing litigation in multiple forums." *Id.* at 163. The uniquely federal nature of this interest led the Supreme Court of Alaska to conclude, in *Alaska v. United Cook Inlet Drift Association*, 895 P.2d 947, 951-52 (Alaska 1995), that the *Mendoza* rule was ill-suited for litigation involving state governmental entities. Other state courts have applied the *Mendoza* rule, or some version of it, in order to shield state governmental entities from the effects of nonmutual offensive collateral estoppel. *See, e.g.*, *First Interstate Bank of Arizona v. State Dept. of Revenue*, 916 P.2d 1149, 1152 (Ariz. Ct. App.1995); *Helene Curtis, Inc. v. Assessment Appeals Bd. of Los Angeles County*, 90 Cal. Rptr. 2d 31, 36 (Cal. Ct. App. 1999); *A&H Vending Co. v. Comm'r of Revenue*, 608 N.W.2d 544, 547 (Minn. 2000); *Bd. of Educ. of St. Louis v. City of St. Louis*, 879 S.W.2d 530, 532 (Mo. 1994); *City of Seattle Executive Servs. Dept. v. Visio Corp.*, 31 P.3d 740, 745-46 (Wash. Ct. App. 2001); *Teriaca v. Milwaukee Employees' Ret. System/Annuity and Pension Bd.*, 667 N.W.2d 791, 796-97 (Wis. Ct. App. 2003).

The court understands that the DPW, like the federal government, is a frequent party to litigation. The reasoning of the state trial court in *Liberto* would essentially require the DPW (or any other state governmental entity) to appeal every adverse determination in order to prevent future litigants from availing themselves of nonmutual offensive collateral estoppel. It is not clear, however, whether the Pennsylvania Supreme Court would adopt the rationale of *Mendoza* in a case such as this. For purposes of this analysis, the court will assume *arguendo* that the

31

Pennsylvania Supreme Court would adopt the *Mendoza* rule and reject the reasoning employed by the state trial court in *Liberto*.

The court need not determine whether Richman and Houstoun are collaterally estopped from attacking the rationale employed by the superior court in *In re C.S.* in this case, since this court concludes that the decision in that case is an accurate statement of the applicable law in Pennsylvania prior to the enactment of section 1409(b)(7)(iii). Like most jurisdictions, Pennsylvania disfavors statutory constructions which would render the language of a given provision superfluous. *Triumph Hosiery Mills, Inc. v. Commonwealth*, 364 A.2d 919, 921 (Pa. 1976). In this case, the construction of section 1409(b)(7)(i) proposed by Richman and Houstoun would not only be contrary to *In re C.S.*, but it would also render section 1409(b)(7)(iii) superfluous. "The Legislature cannot be deemed to intend that its language be superfluous and without import." *Daly v. Hemphill*, 191 A.2d 835, 842 (Pa. 1963). This principle applies with special force where, as here, the construction proposed by a party to a case would render superfluous an entire amendment to a preexisting statute. *Eaton v. Zoning Hearing Bd.*, 471 A.2d 919, 920 (Pa. Commw. Ct. 1984). Whatever may be said about the nonprecedential status of *In re C.S.*, it certainly caught the attention of the Pennsylvania legislature. The enactment of section 1409(b)(7)(iii) cannot be deemed an exercise in futility. *Bowmaster v. Clair*, 933 A.2d 86, 90 (Pa. Super. Ct. 2007) (referring to a presumption that the Pennsylvania legislature "did not intend any statutory language to exist as mere surplusage").

The arguments raised by Richman and Houstoun concerning the status of *In re C.S.* illustrate that they misperceive the judicial role. When a court construes a constitutional or statutory provision, it does not *create* law. Instead, it merely declares what the law is (and what

the law already was prior to the judicial decision). *Danforth v. Minnesota*, 128 S. Ct. 1029, 1035

(2008); *Am. Trucking Ass'ns, Inc. v. Smith*, 496 U.S. 167, 201 (1990) (Scalia, J., concurring in

the judgment). Section 1409(b)(7)(i) was enacted before, and section 1409(b)(7)(iii) was enacted

after, the superior court issued its decision in *In re C.S.* When viewed in the context of the

superior court's decision in *In re C.S.* and the subsequent action taken by the Pennsylvania

legislature in enacting section 1409(b)(7)(iii) to reverse the effects of that decision, section

1409(b)(7)(i) permitted the DPW to recover only *its* expenditures, and not an MCOs'

expenditures, from third parties liable for the injuries sustained by medical assistance recipients.

The court's analysis of the issues in this case proceeds on the conclusion that the superior court

accurately construed section 1409(b)(7)(i) in *In re C.S.*, and that the enactment of section

1409(b)(7)(iii) constituted a "change in" (rather than a "clarification of") Pennsylvania law.[12]

Given the court's view that the arguments raised by Richman and Houstoun concerning the

proper construction of section 1409(b)(7)(i) prior to the addition of section 1409(b)(7)(iii) are not

meritorious in any event, there is no need for the court to determine whether Richman and

Houstoun are collaterally estopped from raising those arguments in the first place.

**C.      The Remedies Available Under 42 U.S.C. § 1983 for Violations of Title XIX**

Tristani and Valenta bring their federal claims pursuant to 42 U.S.C. § 1983, which

provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to

---

[12]In *Bowmaster v. Clair*, 933 A.2d 86, 88 (Pa. Super. Ct. 2007), the Pennsylvania Superior Court was asked to determine whether a Pennsylvania trial court had erred in retroactively applying section 1409(b)(7)(iii). Because the disposition of another question made the resolution of the retroactivity question unnecessary, however, the superior court did not decide the issue. *Bowmaster*, 933 A.2d at 88 n.1.

be subjected, any citizen of the United States or other person within the
jurisdiction thereof to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress, except that in
any action brought against a judicial officer for an act or omission taken in such
officer's judicial capacity, injunctive relief shall not be granted unless a
declaratory decree was violated or declaratory relief was unavailable.  For
purposes of this section, any Act of Congress applicable exclusively to the District
of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  This statute does not create substantive rights.  *Maher v. Gagne*, 448 U.S.

122, 129 n.11 (1980).  A plaintiff cannot prevail in an action brought under § 1983 without

establishing an underlying violation of federal law.  *Collins v. City of Harker Heights*, 503 U.S.

115, 119 (1992).  "Section 1983 itself contains no state-of-mind requirement independent of that

necessary to state a violation of the underlying federal right."  *Bd. of County Comm'rs v. Brown*,

520 U.S. 397, 405 (1997) (internal quotation marks omitted).

Tristani and Valenta allege both constitutional and statutory violations.  (Second Am.

Compl. ¶¶ 155-64.)  The parties do not dispute that the federal constitutional claims at issue, if

proven to be meritorious, are actionable under § 1983.  Richman and Houstoun argue that § 1983

does not provide a remedy for the statutory violations alleged by Tristani and Valenta.  The

statutory claims at issue involve alleged violations of §§ 1396k(b), 1396p(a)(1) and 1396p(b)(1).

The viability of these claims depends upon whether private individuals such as Tristani and

Valenta can enforce the relevant provisions of Title XIX in an action under § 1983.  The court

must approach the resolution of this question with great care.  The determination of who can seek

a remedy for violations of Title XIX has "significant consequences for the reach of federal

power."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 773 (2008).

On some occasions, the Supreme Court has recognized the existence of implied private rights of action under statutes which do not expressly provide for individualized remedies. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 699-717 (1979). An individual suing pursuant to an implied private right of action must show not only that the applicable statute creates a private *right*, but also that it creates a private *remedy*. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Plaintiffs suing under § 1983 need not make an independent showing that the statute in question creates a private remedy, since "§ 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). The language of § 1983 confirms that it was designed to provide a remedy for the deprivation of *rights*, *privileges*, or *immunities* secured by the Constitution and laws of the United States, not to provide a remedy for every violation of federal law. *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989). A plaintiff proceeding under § 1983 must establish not only that the defendant violated federal law, but also that the defendant violated a "right, privilege, or immunit[y]" enjoyed by the plaintiff under that federal law. If Congress wishes to create federal "rights" enforceable under § 1983, "it must do so in clear and unambiguous terms." *Gonzaga Univ.*, 536 U.S. at 290.

In *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997), the Supreme Court explained that a particular statute cannot be deemed to have created a federal "right" enforceable under § 1983 unless it is shown that: (1) Congress intended for the provision in question to benefit the plaintiff (or the class of persons to which the plaintiff belongs); (2) the "right" allegedly protected under the provision is not so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the provision unambiguously imposes a "binding obligation" on the states. In order to impose a "binding obligation" on the states, "the provision giving rise to the asserted

right must be couched in mandatory rather than precatory terms." *Blessing*, 520 U.S. at 341.

Even where a plaintiff is able to make this showing, there is only a "rebuttable presumption" that

the right in question is enforceable under § 1983. *Id.* This presumption can be rebutted by a

showing on the part of the defendant that Congress has "specifically foreclosed a remedy under §

1983" for violations of the relevant statutory provision. *Smith v. Robinson*, 468 U.S. 992, 1005

n.9 (1984). Evidence of that kind of foreclosure can be found either directly in the language of

the statute or indirectly from an inference drawn from the creation of a distinct, comprehensive

enforcement scheme that is incompatible with supplemental enforcement under § 1983. *City of

Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120-21 (2005). A comprehensive enforcement

scheme can be in the form of an enumerated statutory enforcement mechanism or an implied

right of action springing from (or incorporated within) the applicable statute. *A.W. v. Jersey City

Pub. Sch.*, 486 F.3d 791, 803-06 (3d Cir. 2007). With these standards in mind, the court turns to

the particular statutory provisions at issue.

Richman and Houstoun contend that violations of §§ 1396k(b), 1396p(a)(1) and

1396p(b)(1) are not actionable under § 1983. (Doc. No. 65 at 23-29.) As an initial matter, the

Supreme Court has specifically observed that § 1983 provides a remedy for violations of various

provisions of the Social Security Act. *Maine v. Thiboutot*, 448 U.S. 1, 5-6 (1980). It cannot be

seriously argued that claims arising under the Social Security Act are categorically excluded from

the ambit of § 1983's remedial scheme. It is equally true, however, that violations of provisions

contained within a statutory structure as complex as the Social Security Act cannot be deemed to

be categorically actionable under § 1983. The Supreme Court has made it clear that a plaintiff

must "identify with particularity the rights" allegedly created by the federal statute in question.

*Blessing*, 520 U.S. at 342 ("Only when the complaint is broken down into manageable analytic bites can a court ascertain whether each separate claim satisfies the various criteria we have set forth for determining whether a federal statute creates rights.").  The court's inquiry must separately consider each of the particular statutory provisions relied upon by Tristani and Valenta.

Section 1396k(b) provides that:

> [s]uch part of any amount collected by the State under an assignment made under the provisions of [§ 1396k] shall be retained by the State as is necessary to reimburse it for medical assistance payments made on behalf of an individual with respect to whom such assignment was executed (with appropriate reimbursement of the Federal Government to the extent of its participation in the financing of such medical assistance), and the remainder of such amount collected shall be paid to such *individual*.

42 U.S.C. § 1396k(b) (emphasis added).  The statute's use of the word "individual" clearly evinces a congressional intent to confer a "right" on a medical assistance recipient to receive a payment for any excess amounts recovered by a participating state entity from a liable third party.

Tristani and Valenta contend that the DPW's collection practices deprived them (and similarly situated Medicaid recipients) of money to which they were entitled, resulting in a windfall to the DPW.  This situation is not unlike that faced by the Supreme Court in *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990).  The issue in *Wilder* was whether the Boren Amendment to Title XIX was enforceable in an action brought by a health care provider under § 1983.  *Wilder*, 496 U.S. at 501.  The Boren Amendment required states participating in the Medicaid program to reimburse health care providers for medical assistance according to rates that were "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."  *Id.* at 501-02.  The Virginia Hospital Association contended

that Virginia's reimbursement plan violated the Boren Amendment because the applicable

reimbursement rates were insufficient "to meet the economically and efficiently incurred cost of

providing care to Medicaid patients in hospitals." *Id.* at 503. Applying the test that would later

be expounded further in *Blessing*, the Supreme Court held that the Boren Amendment created a

"right" of health care providers to reasonable and adequate reimbursement rates, and that this

right was enforceable under § 1983. *Id.* at 509-10.

The arguments raised by Richman and Houstoun with respect to this issue are rather

generic. They do not attempt to distinguish this case from *Wilder*. Instead, they focus on the

alleged availability of administrative hearings to enforce provisions such as § 1396k(b). The

court acknowledges that the availability of distinct individual remedies under a federal statute is

a factor that may counsel against a finding that violations of "rights" created thereunder are

actionable under § 1983. *Gonzaga Univ.*, 536 U.S. at 289-90. The relevant question, however, is

not whether administrative or judicial remedies are somehow adequate to vindicate the private

interests involved, but rather whether they are sufficiently comprehensive to evince a

congressional intent to foreclose a supplemental remedy under § 1983. *Wilder*, 496 U.S. at 522-

23. A carefully tailored, more restrictive private remedy contained within a statute has often

been the "dividing line" between rights which are enforceable under § 1983 and rights which are

not. *Abrams*, 544 U.S. at 121. A carefully crafted remedial scheme, particularly one involving

pre-litigation exhaustion requirements that are not applicable to § 1983 claims, may prove to be

so incompatible with independent enforcement under § 1983 as to evince a congressional intent

to foreclose an alternative, individual remedial option. *Alex G. v. Bd. of Trs. of David Joint

Unified Sch. Dist.*, 332 F. Supp. 2d 1315, 1317-19 (E.D. Cal. 2004).

Richman and Houstoun base their argument on 42 U.S.C. § 1396a(a)(3).[13]  That section provides that a state plan for medical assistance must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness."  42 U.S.C. § 1396a(a)(3).  This provision, however, does not address matters raised by § 1396k(b), which concerns reimbursement for excess proceeds collected by a state agency from a liable third party *after* a claim for medical assistance has already been honored.  42 U.S.C. § 1396k(b).  Remedies available under the law of a particular state (but not contemplated by Congress) are not relevant to this inquiry, which focuses on whether *Congress* intended to foreclose a remedy under § 1983.[14]  *Fitzgerald v. Barnstable Sch. Comm.* 129 S. Ct. 788, 795-96 (2009); *Blessing*, 520 U.S. at 341.  Since § 1396k(b) is, in all relevant respects, indistinguishable from the provision discussed by the Supreme Court in *Wilder*, the court holds that the statements under §§ 1396k(b), 1396p(a)(1) and 1396p(b)(1) are not sufficiently comprehensive and do not evince a congressional intent to foreclose a supplemental remedy under § 1983 and that § 1983 provides a remedy to vindicate the reimbursement "right" created by § 1396k(b).  *Newark Parents Ass'n v. Newark Pub. Sch.*, 547 F.3d 199, 212 (3d Cir. 2008).

---

[13]In their brief, Richman and Houstoun also cite 45 C.F.R. § 205.10.  (Docket No. 65 at 28.)  45 C.F.R. § 205.10 applies to public assistance programs under Titles I, IV-A, X, XIV and XVI(AABD) of the Social Security Act.  They do not explain what relevance this regulation has to Title XIX.

[14]It is worth noting that the United States Court of Appeals for the Third Circuit concluded in *Sabree v. Richman*, 367 F.3d 180, 193 (3d Cir. 2004), that the availability of state administrative hearings pursuant to § 1396a(a)(3) was insufficient to evince a congressional intent to foreclose § 1983 actions for violations of other provisions of Title XIX.  Unlike the situation in *Sabree*, in which § 1396a(a)(3) at least appeared to be applicable to the situation at issue, the court concludes that it is squarely inapplicable to the circumstances of this case.  Even if the court is incorrect with respect to that point, the reasoning of the court of appeals in *Sabree* would compel the conclusion that § 1396a(a)(3) does not foreclose individual actions brought under § 1983 for violations of Title XIX.

Section 1396p(a)(1), which is Title XIX's anti-lien provision, provides that "[n]o lien may be imposed against the property of any *individual* prior to *his* death on account of medical assistance paid or to be paid on *his* behalf under the State plan . . . ." 42 U.S.C. § 1396p(a)(1) (emphasis added). Section 1396p(b)(1), which is Title XIX's anti-recovery provision, provides that "[n]o adjustment or recovery of any medical assistance correctly paid on behalf of an *individual* under the State plan may be made . . . ." 42 U.S.C. § 1396p(b)(1) (emphasis added). These provisions contemplate the protection of an "individual," making it clear that Congress intended to benefit individual medical assistance recipients such as Tristani and Valenta. *Blessing*, 520 U.S. at 340. Although the parties disagree with respect to the substantive effects of these provisions in this case, it cannot be fairly said that the rights created thereunder are "so 'vague and amorphous' that [their] enforcement would strain judicial competence." *Id.* at 340-41. The prohibitions are clearly "couched in mandatory rather than precatory terms." *Id.* at 341. Although the word "may" is often associated with precatory language when it is used to describe an affirmative aspiration or wish, its use in this negative context indicates that it imposes mandatory obligations akin to those more commonly associated with the word "shall." *White v. Engler*, 188 F. Supp. 2d 730, 745 (E.D. Mich. 2001). While statutory language providing that a lien "may" be imposed would differ meaningfully from statutory language providing that a lien "shall" be imposed, the language in § 1396p(a)(1) stating that "[n]o lien *may* be imposed" has virtually the same meaning as would language stating that "no lien *shall* be imposed." This same principle applies to the anti-recovery provision contained in § 1396p(b)(1). The "text and structure" of these provisions indicate that Congress intended to create *individual rights*. *Gonzaga Univ.*, 536 U.S. at 286.

Under § 1396a(a)(18), a state plan for medical assistance must "comply with the provisions of [§ 1396p] with respect to liens, adjustments and recoveries of medical assistance correctly paid . . . ." 42 U.S.C. § 1396a(a)(18). The court notes that two district courts within this circuit have held that § 1396a(a)(18) creates individual "rights" that are enforceable under § 1983. *Lewis v. Rendell*, 501 F. Supp. 2d 671, 687-88 (E.D. Pa. 2007); *Johnson v. Guhl*, 91 F. Supp. 2d 754, 770 (D.N.J. 2000). The United States Court of Appeals for the Third Circuit concluded in *Sabree v. Richman*, 367 F.3d 180, 192 (3d Cir. 2004), that the overall structure of Title XIX was compatible with a determination that "rights-creating language" could be found in some of its provisions. The court of appeals found such language in three of Title XIX's provisions. *Sabree*, 367 F.3d at 192. In addition, the court of appeals determined that Title XIX did not have a "comprehensive remedial scheme" that was incompatible with individual actions under § 1983. *Id.* at 193.

The court already concluded that §§ 1396p(a)(1) and 1396p(b)(1), like § 1396k(b), create individual rights. These "rights" are "presumptively enforceable" under § 1983. *Gonzaga Univ.*, 536 U.S. at 284. The burden is on Richman and Houstoun to demonstrate that Congress precluded reliance on § 1983 to remedy violations of those rights. *Sabree*, 367 F.3d at 193. They did not meet this burden. The arguments advanced in their brief are not materially different from those that were expressly rejected by the court of appeals in *Sabree*. Under these circumstances, Tristani and Valenta can invoke the remedies available under § 1983 to redress violations of the "rights" created by Title XIX's anti-lien and anti-recovery provisions.

The court holds that violations of the rights contained in §§ 1396k(b), 1396p(a)(1) and 1396p(b)(1) are actionable under § 1983. With that in mind, the court now turns to the merits of the claims asserted by Tristani and Valenta under those statutory provisions.

**D.     The Merits of the Title XIX Claims**

The court acknowledges that the parties disagree with respect to whether the relief sought by Tristani and Valenta against Richman and Houstoun in their individual capacities (i.e., reimbursement for money alleged to have been illegally collected by the DPW) constitutes "legal" relief or "equitable" relief. (Docket No. 79 at 47-48.) That issue is relevant to the question whether Richman and Houstoun are entitled to qualified immunity. *See Grantham v. Trickey*, 21 F.3d 289, 295 (8th Cir. 1994). Richman and Houstoun are "persons" within the meaning of § 1983 to the extent that they are being sued in their individual capacities. *Hafer v. Melo*, 502 U.S. 21, 25-31 (1991). The nature of the relief sought becomes relevant only if Tristani and Valenta can prevail on the merits of their claims. *See Cox v. Sugg*, 484 F.3d 1062, 1068 (8th Cir. 2007). The first step in the qualified immunity analysis is to determine whether an actionable violation of a federal right can be established in the first place.[15] *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This case is clouded by the question whether Tristani and Valenta have standing (as class representatives or otherwise) to seek injunctive relief under *Ex parte Young*,

_____

[15]In *Pearson v. Callahan*, 129 S.Ct. 808, 818-22 (2009), the Supreme Court overruled its prior decision in *Saucier v. Katz*, 533 U.S. 194 (2001), to the extent that it had *required* a federal court to determine the underlying merits of a claim before determining whether the defendant in question was entitled to qualified immunity. The Supreme Court, however, made it clear that the sequence set forth in *Saucier* is often beneficial, and that courts retain the discretion to employ it where appropriate. *Pearson*, 129 S.Ct. at 818, 821-22. In this case, the court will proceed in accordance with the *Saucier* framework. Tristani and Valenta seek injunctive relief against Richman in her official capacity, and qualified immunity does not shield a state official from that kind of relief. *Id.* at 821-22. Although the court does not reach the question whether Tristani and Valenta have standing to seek injunctive relief (either on their own behalf or on behalf of a proposed class), the court's resolution of the substantive issues at this stage will facilitate the orderly resolution of other issues at the class certification stage.

209 U.S. 123 (1908), against Richman in her official capacity. In any event, there is no question

that Tristani and Valenta have standing to pursue their individual-capacity claims for

reimbursement. Consequently, the court can now proceed to address the merits of the claims

asserted by Tristani and Valenta under Title XIX.

**1.      The Reimbursement Provision**

Tristani and Valenta argue that the DPW violated § 1396k(b)'s reimbursement provision

by collecting the expenditures incurred by MCOs in providing medical assistance to Medicaid

recipients rather than the amounts of the capitation payments paid by the DPW to ensure that the

MCOs would continue to provide medical assistance to eligible individuals. The court

determined that the analysis of this issue will proceed with the understanding that, prior to July 7,

2005, Pennsylvania law prohibited the DPW from collecting more than the amounts of the

capitation payments made to MCOs in situations where the actual payments for medical

assistance were made by MCOs rather than by the DPW. The question whether the collection of

an MCO's expenses violated *federal* law, however, involves an altogether different inquiry.

The Supremacy Clause of Article VI of the United States Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in
> Pursuance thereof; and all Treaties made, or which shall be made, under the
> Authority of the United States, shall be the supreme Law of the Land; and the
> Judges in every State shall be bound thereby, any Thing in the Constitution or
> Laws of any state to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. By enacting the Supremacy Clause, the framers of our Constitution

ensured that a particular jurisdiction could not frustrate the purposes of federal law in the name

of local interests. Where the mandate of a state law conflicts with the mandate of a federal law,

the application of the state law is unconstitutional.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000).

Tristani and Valenta contend that section 1409(b)(7)(iii) is preempted by § 1396k(b). Tristani's check for $148,508.99 was sent to the DPW on July 5, 2005, only two days before the enactment of section 1409(b)(7)(iii).  (Defs.' Summ. J. App. 15A.)  Valenta's check for $10,000.00 was sent to the DPW on August 18, 2005.  (*Id.* 90A.)  By that time, section 1409(b)(7)(iii) was effective.  The parties, however, do not focus on the timeframe of Valenta's payment to the DPW in relation to the enactment of section 1409(b)(7)(iii).  Instead, they take much broader views of the issue.  Richman and Houstoun argue that *In re C.S.* was wrongly decided, and that section 1409(b)(7)(iii) simply codified the Pennsylvania legislature's preexisting understanding in the aftermath of that decision.  Tristani and Valenta assert that section 1409(b)(7)(iii) is void (and was void from its inception) because it is preempted by § 1396k(b).  Although polar opposites, these arguments both rest on the premise that section 1409(b)(7)(iii) did not *change* the law.  Although this court rejected the argument advanced by Richman and Houstoun, it does not necessarily follow that Tristani and Valenta are correct. Whether the DPW violated Pennsylvania law is a different question from whether the DPW violated federal law.

Title XIX's reimbursement provision provides that a state shall retain proceeds collected under an assignment made pursuant to § 1396k(a)(1) "as is necessary to reimburse it for medical assistance payments made on behalf of an individual with respect to whom such assignment was executed (with appropriate reimbursement of the Federal Government to the extent of its participation in the financing of such medical assistance)," and that "the remainder of such

amount collected shall be paid to such individual." 42 U.S.C. § 1396k(b). Tristani and Valenta

focus on the word "it" by arguing that the DPW is only permitted to collect *its* expenditures,

which (in the case of recipients serviced through managed care programs) consist only of the

capitation payments made to the MCOs. Richman and Houstoun focus on the phrase "for

medical assistance payments made on behalf of an individual" by pointing out that the MCOs

actually make "medical assistance payments on behalf of an individual" in the managed care

setting, and that *nobody* can recover the amounts of such payments if the argument advanced by

plaintiffs is correct. (Docket No. 82 at 12-14.)

It is undisputed that in practice the DPW recovers the actual expenditures of the MCOs

rather than the amounts of the capitation payments. Kathy Martofel ("Martofel"), the DPW's

chief of third-party liability, on February 19, 2008, testified as follows:

> Q.  I'm going to ask you some more general questions right now. There are
>     some situations then where the Department will recover from a beneficiary
>     third party tort recovery a lot more money than the Department itself
>     expended for that individual through the MCO program and capitated
>     payments. Is that accurate?
>
> A.  It could be, just depends on the case.
>
> Q.  Okay. You have seen such an instance before though?
>
> A.  Yes. There's winners and losers. I mean there are times when we might
>     recover more. But because we compromise our cases, that doesn't often
>     happen.
>
> Q.  Could you explain what you meant to me there, there are times where you
>     recover more, but because you compromise your cases it doesn't often
>     happen?
>
> A.  Right. I mean whatever we expend, when we do a statement of claim, it
>     could be for $100,000. When the settlement is done, the total settlement

could be $100,000.  So obviously we have to compromise and only take back a portion of what we paid.

Q.      But assuming that you had a claim that you believe to be a 100,000 and the settlement was a million, then you would get the full 100,000 back?

A.      We would.

Q.      For that individual you would pay a much smaller amount in capitated payments?

A.      That's possible.

Q.      And that has, in fact, happened?

A.      Yes.

(Defs.' Summ. J. App. 186A-87A, Martofel Dep. at 25-26.)  The DPW's collection practices apparently remained the same between January 31, 2005, which was the date of the superior court's decision in *In re C.S.*, and July 7, 2005, which was the date on which section 1409(b)(7)(iii) was enacted.  On February 8, 2008, Carole Procope ("Procope"), the manager of the DPW's recovery section, testified that the DPW continued to collect the amounts of the MCOs' expenditures (rather than the amounts of the capitation payments) during that period of time.  (Defs.' Summ. J. App. 160A, Procope Dep. at 42-43.)

Martofel's statement that there are "winners and losers" illustrates the nature of the DPW's collection practices in the managed care setting.  In circumstances where an MCO's expenditures on behalf of a Medicaid recipient exceed the amount of the capitation payments made for the benefit of that recipient, the DPW recovers (or attempts to recover) more than it pays.  The recovery sought equals the amount of the expenditures incurred by the MCO, not the lesser amount of the capitation payments made to the MCO by the DPW.  This is the "windfall"

that the superior court found to be in violation of Pennsylvania law. (Docket No. 28 at 7.) Of

course, section 1409(b)(7)(iii) now authorizes this manner of collection. On the other hand, the

DPW sometimes collects less than it spends for the benefit of a particular Medicaid recipient

(even if the compromises referenced in Martofel's testimony are not considered). In

circumstances where the total amount of the capitation payments made by the DPW to an MCO

for the benefit of a particular Medicaid recipient exceeds the expenses incurred by the MCO to

provide medical assistance to that recipient, the DPW collects the lesser amount (i.e., the amount

spent by the MCO for the care of the recipient). This collection practice was specifically

endorsed by the United States Department of Health and Human Services ("DHHS") in a letter

from Dennis Gallagher ("Gallagher"), the chief of the DHHS' Family and Children's Health

Branch, to William T. Miller ("Miller"), the chief of the DPW's third-party liability section,

dated October 27, 1997. (Defs.' Summ. J. App. 217A.) In that letter, Gallagher opined that

> it would be inappropriate for Pennsylvania to use the capitation payment as the
> estimate of the actual Medicaid expenditure. We say this primarily because the
> capitation payment for a [managed care] member is essentially a discounted
> estimate of the average per member per month cost of care based on the total
> universe of Medicaid beneficiaries' experience[s] in the fee-for-service setting.

*Id.*

It is not entirely clear whether the DPW's practice of collecting MCO expenditures from

the awards or settlements obtained by managed-care Medicaid recipients conforms to the

reimbursement provision contained in § 1396k(b). Under these circumstances, however, there is

no need for the court to decide that issue, since it is clear that neither Tristani nor Valenta can

establish a violation of § 1396k(b) on the basis of the DPW's decision to collect the amount of an

MCO's expenditures rather than the amount of its own capitation payments. In a declaration

dated February 21, 2008, Strawbridge declared that all of the $247,514.98 spent for the benefit of Tristani was paid directly by the DPW, and that none of Tristani's medical expenses were paid by an MCO. (Defs.' Summ. J. App. 45A, Decl. of Jessica Strawbridge.) This declaration is supported by the record. (Defs.' Summ. J. App. 44A.) Tristani concedes that none of her medical expenses were paid by an MCO.[16] (Joint Concise Statement of Material Facts, Defs.' Facts ("J.S.D.") at ¶ 27.) Since Tristani's medical care was financed in accordance with a fee-for-service arrangement, her § 1396k(b) claim must fail.

Valenta is likewise unable to establish a violation of § 1396k(b). Although he was enrolled in an MCO, only $42.35 of his medical expenses were paid by an MCO. (J.S.D. ¶ 37.) The remainder of the $15,581.86 expended for his benefit was paid directly by the DPW. (*Id.*) This undisputed fact was confirmed in a declaration by Sohn dated February 14, 2008. (Defs' Summ. J. App. 107A, Decl. of Margaret Sohn.) The record indicates that the DPW spent $1,001.90 in capitation payments to an MCO for Valenta's benefit. (Defs' Summ. J. App. 106A.) The DPW's capitation payments on behalf of Valenta exceeded the expenses incurred by an MCO for his benefit by $959.55. Even if Valenta's proposed construction of § 1396k(b) is correct (i.e., even if it is unlawful for the DPW to collect the amount spent by an MCO for a particular Medicaid recipient where that amount exceeds the amount of the capitation payments paid by the DPW to the MCO for the recipient's benefit), Valenta cannot establish a violation of § 1396k(b).

---

[16]In a brief filed on May 16, 2008, Tristani argued that she had probably been enrolled in an MCO because of her residence in a "mandatory MCO county." (Docket No. 79 at 14.) She also contended that Richman and Houstoun had failed to provide her with documentation concerning her alleged lack of enrollment in an MCO. (*Id.*) Nevertheless, in a Joint Concise Statement of Material Facts filed on June 27, 2008, Tristani acknowledged that none of her medical expenses had been paid by an MCO. (J.S.D. ¶ 27.)

Valenta argues that he is entitled to nominal damages due to the DPW's decision to obtain compensation for the $42.35 spent by an MCO for his medical expenses rather than for the $1,001.90 spent by the DPW in capitation fees for his benefit. This argument is without merit. In *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978), the Supreme Court held that, even in the absence of actual injury, a plaintiff who establishes a procedural due process violation can recover nominal damages in an action brought under § 1983. The Supreme Court explained that "[b]ecause the right to procedural due process is 'absolute' in the sense that it does not depend on the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed," a denial of procedural due process is actionable under § 1983 for nominal damages even where the plaintiff cannot establish the "actual injury" needed for the recovery of compensatory damages. *Carey*, 435 U.S. at 266-67.

*Carey*, however, provides no basis for Valenta's argument with respect to § 1396k(b). As in any case brought under § 1983, Valenta cannot recover unless he can establish a violation of an underlying federal right. *See Daniels v. Williams*, 474 U.S. 327, 330 (1986). Valenta cannot establish a violation of § 1396k(b). The Due Process Clause of the Fourteenth Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1. In the *procedural* due process context, the Constitution is violated not merely when a state deprives an individual of liberty or property, but rather when the State deprives an individual of liberty or property *without due process of law*. *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990). In circumstances where due process has been denied but would not have prevented the "deprivation" at issue in any event, a plaintiff can still establish a violation of the "absolute" right to procedural due process. *Carey*, 435 U.S. at 266-

67.  The plaintiff can recover nominal damages because he or she has established an underlying

violation of the Due Process Clause, even if no damages actually resulted from that constitutional

violation.  *Id.*

In contrast, what is at issue here is not an "absolute" right like that discussed in *Carey*,

but rather a qualified right dependent upon a set of circumstances that was not present in

Valenta's case.  Under § 1396k(b), a state is required to pay to a Medicaid recipient the

"remainder" of the proceeds collected from a liable third party after the state has reimbursed

itself (and the federal government) for any expenditures incurred in providing medical assistance

to the recipient.  42 U.S.C. § 1396k(b).  This obligation to pay arises *if*, and *only if*, there is a

*remainder* of proceeds after the state has reimbursed itself (and the federal government).  Where

no remainder exists, no obligation to pay arises.  While a state's failure to pay a remainder to a

Medicaid beneficiary would violate § 1396k(b), no such *failure* to pay can occur in the absence

of an *obligation* to pay.  Valenta argues that the DPW should have sought compensation for the

$1,001.90 that it paid to an MCO for his benefit rather than for the $42.35 that the MCO incurred

in providing him with medical assistance.  Since the DPW actually sought *less* than the capitation

amount that Valenta believes to have been appropriate, there was clearly no "remainder" of

proceeds that should have been paid to Valenta under § 1396k(b).  Consequently, Valenta cannot

establish a violation of any "right" conferred on him by § 1396k(b).

Since neither Tristani nor Valenta can establish a violation of § 1396k(b) on the basis of

the DPW's practice of seeking reimbursement for an MCO's expenditures on behalf of a given

Medicaid recipient rather than for the capitation payments made by the DPW to the MCO for the

benefit of the recipient, the court need not decide whether section 1409(b)(7)(iii) contravenes §

1396k(b).  It suffices to say that the claims asserted by Tristani and Valenta under § 1983 for

violations of § 1396k(b) must be dismissed.  The court expresses no opinion as about whether

section 1409(b)(7)(iii) can be constitutionally applied, or about whether Tristani and Valenta

have standing to represent a proposed class of individuals whose settlement proceeds were (or

will be) depleted because of the DPW's allegedly illegal practice of seeking compensation for the

medical expenses incurred by MCOs rather than for the capitation expenses incurred by the DPW

in the managed care setting.

**2.      The Anti-Lien and Anti-Recovery Provisions**

Tristani and Valenta make two distinct arguments concerning Title XIX's anti-lien

provision.  First, they contend that the DPW violated the anti-lien provision by recouping

settlement proceeds attributable to expenses unrelated to medical care, which is contrary to the

Supreme Court's decision in *Ahlborn*.  Second, they argue that the anti-lien provision, when

properly construed, prohibits the DPW from placing a lien on *any* portion of a Medicaid

recipient's settlement proceeds, including the portion attributable to medical expenses.  Their

argument concerning the anti-recovery provision is interrelated with their second argument

concerning the anti-lien provision.  Therefore, those provisions will be discussed together.

**a.      The Application of *Ahlborn***

The Supreme Court issued its decision in *Ahlborn* on May 1, 2006.  It is undisputed that

Tristani and Valenta both sent their checks to the DPW before *Ahlborn* was decided.  There are

many unanswered questions about whether (and how) *Ahlborn* should be applied in

circumstances where payments to satisfy allegedly illegal liens have already been made.  *See*

*Paopao v. Dep't of Soc. & Health Servs.*, 185 P.3d 640, 642-46 (Wash. Ct. App. 2008).  The

court need not confront those issues in this case, however, because neither Tristani nor Valenta can establish an "*Ahlborn* violation."

The court acknowledges that plaintiffs challenge the very premise that the DPW was permitted to place liens on their settlement proceeds in the first place. For purposes of the *Ahlborn* analysis, the court assumes *arguendo* (as the Supreme Court did in *Ahlborn*) that §§ 1396a(a)(25) and 1396k(a) carve an exception into § 1396p(a)(1), thereby permitting a state entity such as the DPW to impose a lien on the portion of a Medicaid recipient's third-party liability settlement attributable to payments for medical assistance made by the Medicaid program. *Ahlborn*, 547 U.S. at 284. This "exception" permits the imposition of a lien only on the portion of a Medicaid recipient's settlement that is attributable to payments for medical assistance. Beyond that, § 1396p(a)(1)'s anti-lien provision applies. *Id.* at 284-85.

The circumstances in *Ahlborn* were materially different than the circumstances in this case. In *Ahlborn*, the parties entered into stipulations which governed the allocation of the Medicaid recipient's settlement proceeds. *Id.* at 274. They also stipulated to the amount that the underlying claim had been worth, with the understanding that the settlement agreement at issue had accounted for only one-sixth of the value of the claim. *Id.* Consequently, the Supreme Court was presented with a neatly packaged legal question that did not require significant inquiry about how a settlement amount should be allocated in circumstances where the differing amounts claimed by the parties are subject to serious dispute. The Supreme Court specifically noted that it was not deciding whether a state could adopt special rules or procedures for allocating tort settlement proceeds for the purpose of preventing Medicaid recipients from seeking to

manipulate their damage allocations in order to prevent the state from asserting a claim for reimbursement. *Id.* at 288 n.18.

Tristani settled her medical malpractice case for a total of $5,200,000.00. (Defs.' Summ. J. App. 35A-36A.) Only $148,508.99 of that figure was paid to the DPW. (*Id.* 15A.) Valenta's total gross recovery for his injuries was $130,000.00. (J.S.P. ¶ 13.) Only $10,000.00 of that figure was paid to the DPW. (Defs.' Summ. J. App. 90A.) The amounts paid to the DPW represented amounts paid for medical assistance by the Medicaid program, with appropriate reductions for attorneys' fees and litigation expenses. The DPW received approximately 2.856% of Tristani's settlement award and approximately 7.692% of Valenta's total gross recovery.

Tristani and Valenta both contend that they were not "made whole" by their settlement awards. (J.S.P. ¶¶ 14, 41.) They believe that since they were compensated for only fractions of the damages that they sustained, the DPW should have been reimbursed for only fractions of its expenditures (i.e., the fractions of the settlement proceeds attributable to payments for medical assistance made by the DPW for the benefit of Tristani and Valenta). Neither Tristani nor Valenta attempted to negotiate a reduced lien amount with the DPW in order to limit the DPW's recovery to the settlement portion attributable to payments for medical assistance. (*Id.* at ¶¶ 19, 29.) It is undisputed that no portion of either settlement was specifically allocated for medical expenses. (*Id.* at ¶ 90.)

Relevant to the court's analysis is 62 Pa. Stat. Ann. § 1409(b)(11), which provides:

> Except as otherwise provided in this act, notwithstanding any other provision of law, the entire amount of any settlement of the injured beneficiary's action or claim, with or without suit, is subject to the department's claim for reimbursement of the benefits provided any lien filed pursuant thereto, but in no event shall the department's claim exceed one-half of the beneficiary's recovery after deducting

53

for attorney's fees, litigation costs, and medical expenses relating to the injury paid for by the beneficiary.

62 PA. STAT. ANN. § 1409(b)(11). In a policy statement published in the *Pennsylvania Bulletin* on September 8, 2007, Richman construed section 1409(b)(11) "to establish a statutory default rule of allocation for tort recoveries consistent with *Ahlborn*." 37 Pa. Bull. 4881, 4882 (Sept. 8, 2007). This construction of the statute meant that, in the absence of a specific judicial allocation of damages, up to one-half of a settlement award (after deductions for attorneys' fees, litigation costs, and medical expenses incurred directly by the Medicaid recipient) was deemed to be attributable to medical expenses incurred by the DPW, not to exceed the amount actually spent by the DPW (or by an MCO). In that same policy statement, Richman declared that if a Medicaid beneficiary sought to obtain a court order limiting the portion of a recovery from which the DPW could be paid to less than one-half of the net proceeds or excluding amounts paid by the Medicaid program from a recovery, the DPW should be provided with fair notice and an opportunity to protect its interests. *Id.* at 4884.

It is clear that the amounts of the DPW's liens were decreased to account for the litigation expenses and attorneys' fees paid by Tristani and Valenta. (Defs.' Summ. J. App. 14A; J.S.P. ¶ 18.) Neither Tristani nor Valenta point to evidence indicating that he or she incurred medical expenses aside from those paid by the Medicaid program. Under these circumstances, it appears that the sums paid to the DPW by Tristani and Valenta were essentially allocated to medical expenses by operation of law. In *Department of Health & Welfare v. Hudelson*, 196 P.3d 905, 911 (Idaho 2008), the Supreme Court of Idaho declared that "*Ahlborn* does not prohibit states from implementing procedures on how to allocate unallocated settlements." In *Andrews v.*

54

*Haygood*, 669 S.E.2d 310, 314 (N.C. 2008), the Supreme Court of North Carolina upheld North Carolina's default statutory allocation scheme, which limited the state's recovery to one-third of the gross amount obtained or recovered by a Medicaid recipient from a liable third party. A close reading of *Ahlborn* confirms the correctness of the reasoning employed by the Idaho Supreme Court and the North Carolina Supreme Court.

The default approach employed by the DPW in the aftermath of *Ahlborn* differs meaningfully from the Arkansas statute invalidated by the Supreme Court. Unlike the Pennsylvania statute, the Arkansas statute at issue in *Ahlborn* permitted the state to recover the full amount of a Medicaid beneficiary's award (if necessary to reimburse itself for the costs of providing medical assistance to that beneficiary) even where a jury had allocated only a subset of that award to medical expenses. *Ahlborn*, 547 U.S. at 278-79. There was no provision like section 1409(b)(11), which recognizes that there are *some* portions of a settlement award (i.e., medical expenses aside from those paid by the Medicaid program and at least one-half of the remaining proceeds) that cannot be attributed to Medicaid expenditures and, hence, cannot be recovered by the DPW. Admittedly, prior to the enactment of section 1409.1, the Pennsylvania statute permitted the DPW to claim more than the portion of a settlement award allocated to Medicaid expenditures in circumstances where the payments made by the DPW exceeded the amount of the allocation but were nevertheless less than one-half of the total settlement amount (after the requisite deductions for litigation costs, attorneys' fees, and medical expenses incurred directly by the Medicaid beneficiary). The awards received by Tristani and Valenta, however, were never allocated, making the statutory default allocation applicable in any event.

The court acknowledges that the DPW received payments from Tristani and Valenta before *Ahlborn* was decided and, hence, before Richman officially recognized section 1409(b)(11) as a statutory "default" allocation mechanism. The DPW's treatment of unallocated settlements prior to the issuance of Richman's policy statement was, in all material respects, identical to its treatment of such settlements after the issuance of the policy statement. Nothing in *Ahlborn* prevents a state from defaulting to a statutory allocation mechanism like that found in section 1409(b)(11). Having failed to obtain specific allocations of their settlement awards when they had chances to do so, Tristani and Valenta cannot escape the application of Pennsylvania law merely because, in hindsight, they realize that they might have acted differently had they been able to foresee future legal developments.

Even if the court were not persuaded that Pennsylvania could revert to section 1409(b)(11) in the absence of a specific allocation of damages within a particular settlement award, the *Ahlborn* claims asserted by Tristani and Valenta would nevertheless fail for another reason. These claims are premised on the argument that Tristani and Valenta were not "made whole" by their settlement awards. Obviously, if they were made whole, the amounts recovered by the DPW were proper. *Ahlborn* requires the DPW to accept reduced recoveries (i.e., fractions of its expenditures) only where the Medicaid beneficiaries themselves receive reduced recoveries (i.e., awards which compensate them for only fractions of the damages that they have sustained). Under Pennsylvania law, however, a settlement conclusively establishes the settlement amount as full compensation for the damages sustained by the settling plaintiff and essentially operates as a waiver of any right that he or she may otherwise have to a judicial determination of his or her losses. *Goldberg v. Workmen's Comp. Appeal Bd.*, 620 A.2d 550, 564 (Pa. Commw. Ct. 1993).

56

When a plaintiff agrees to a settlement, he or she is later estopped from claiming that his or her

actual damages were in excess of the amount for which he or she ultimately settled. *Allstate Ins.*

*Co. v. Clarke*, 527 A.2d 1021, 1025 n.4 (Pa. Super. Ct. 1987). Since Pennsylvania law

recognized the settlement awards obtained by Tristani and Valenta as full compensation for their

injuries, the amounts paid to the DPW were "equal to" (rather than "greater than") the portions of

the settlement awards attributable to medical expenses incurred by the Medicaid program.

*Holloran v. Larrieu*, 637 A.2d 317, 322 n.5 (Pa. Super. Ct. 1994) ("While malpractice litigation

is often quite costly, the presentation of medical expenses is usually the simplest part of the

case."). Accordingly, the DPW did not act contrary to *Ahlborn* when it collected the amounts in

question from Tristani and Valenta.

**b.      The Construction of the Anti-Lien and Anti-Recovery Provisions**

The court's determination that Tristani and Valenta cannot establish that the DPW laid

claim to improper *amounts* of their settlement awards does not end the inquiry with respect to the

anti-lien provision. The broader question presented in this case is whether the DPW's *manner* of

collection contravenes § 1396p(a)(1). In other words, Tristani and Valenta ask the court to

decide whether it was legal for the DPW to assert liens against their settlement awards *at all*,

regardless of how the amounts of those liens were calculated. In *Alhlborn*, the Supreme Court

observed:

> Read literally and in isolation, the anti-lien prohibition contained in §
> 1396p(a) would appear to ban even a lien on that portion of the settlement
> proceeds that represents payments for medical care. Ahlborn does not ask us to
> go so far, though; she assumes that the State's lien is consistent with federal law
> insofar as it encumbers proceeds designated as payments for medical care. Her
> argument, rather, is that the anti-lien provision precludes attachment or
> encumbrance of the remainder of the settlement.

We agree. There is no question that the State can require an assignment of the right, or chose in action, to receive payments for medical care. So much is expressly provided for by §§ 1396a(a)(25) and 1396k(a). And we *assume*, as do the parties, that the State can also demand as a condition of Medicaid eligibility that the recipient "assign" in advance any payments that may constitute reimbursement for medical costs. *To the extent* that the forced assignment is expressly authorized by the terms of §§ 1396a(a)(25) and 1396k(a), it is an exception to the anti-lien provision. See *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 383-385, and n. 7, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003). But that does not mean that the State can force an assignment of, or place a lien on, any other portion of Ahlborn's property. As explained above, the exception carved out by §§ 1396a(a)(25) and 1396k(a) is limited to payments for medical care. Beyond that, the anti-lien provision applies.

*Ahlborn*, 547 U.S. at 284-85 (emphasis added; footnote omitted). In a subsequent portion of its opinion, the Supreme Court stated that, "with the *possible* exception of a lien on payments for medical care, the [anti-lien provision] expressly prohibits liens against the property of Medicaid beneficiaries." *Id.* at 291-92 (emphasis added).

Some courts have construed the Supreme Court's assumption in *Ahlborn* as an indication that §§ 1396a(a)(25) and 1396k(a) carve an exception into § 1396p(a)(1). *In re Zyprexa Prod. Liab. Litig.*, 451 F.Supp.2d 458, 470 (E.D.N.Y. 2006); *Connecticut v. Peters*, 946 A.2d 1231, 1239 n.19 (Conn. 2008). Richman and Houstoun rely on the Supreme Court's language in *Ahlborn* for the proposition that §§ 1396a(a)(25) and 1396k(a) do, in fact, create an exception to the anti-lien provision. A careful reading of *Ahlborn* reveals that the Supreme Court simply did not decide this issue. Instead, it assumed *arguendo* that the "exception" existed because neither party to the case advanced an argument to the contrary. The Supreme Court referred to this hypothetical exception to § 1396p(a)(1) as a "possible exception" toward the end of its opinion. *Ahlborn*, 547 U.S. at 291-92. In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court explained that it "often grants certiorari to decide particular legal issues while

assuming without deciding the validity of antecedent propositions." *Verdugo-Urquidez*, 494 U.S. at 272. Assumptions made in this context "are not binding in future cases," since they have not been squarely considered by the Supreme Court. *Id.* at 272. The mere fact that the Supreme Court has made an *assumption* in an earlier case does not necessarily mean that it will subsequently render a *holding* in conformity with that assumption when the relevant issue is squarely presented for resolution. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 63 n.4 (1989). For this reason, the question whether §§ 1396a(a)(25) and 1396k(a) carve an "exception" into § 1396p(a)(1) remains an open question. *McMillian*, 83 Cal. Rptr. 3d at 272-73.

Tristani and Valenta unambiguously ask the court to *decide* the question that was the subject of the Supreme Court's *assumption* in *Ahlborn*. (Doc. No. 79 at 28 ("The Plaintiffs are now asking this Court to undertake that additional analysis.").) They contend that the plain and unambiguous language of § 1396p(a)(1) prohibits liens of the kind asserted against their settlement proceeds by the DPW. (*Id.* at 28-29.) They also argue that the anti-recovery provision prohibited the DPW from seeking "recoveries" of the medical assistance that had been correctly paid on their behalf. (*Id.* at 29.) Richman and Houstoun, on the other hand, contend that §§ 1396a(a)(25) and 1396k(a) create exceptions to the anti-lien and anti-recovery provisions, thereby permitting entities such as the DPW to impose liens against, and pursue reimbursement payments from, awards and recoveries secured by Medicaid recipients from liable third parties.

"Liens" and "recoveries" of the kind challenged by Tristani and Valenta in this case are authorized under Pennsylvania law. 62 PA. STAT. ANN. §§ 1409(b)(7)(i), 1409.1(b)(1). A determination that Title XIX's anti-lien and anti-recovery provisions proscribe liens and

recoveries of the kind at issue here would necessarily warrant a determination that the applicable provisions of Pennsylvania law are preempted. Preemption occurs where "the scope of a statute indicates that Congress intended federal law to occupy a field exclusively" or where "state law is in actual conflict with federal law." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002). Field preemption may be found either explicitly within the express language of a federal statute or implicitly within the statute's structure and purpose. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Conflict preemption may be found where compliance with both federal and state law is impossible, or where state law stands as an obstacle to the purposes and objectives of the relevant federal statute. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). In areas of "traditional state regulation," courts generally "assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005).

It is clear that "field preemption" is not present, since § 1396a(a)(25)(H) expressly requires a state plan for medical assistance to provide

> that to the extent that payment has been made under the State plan for medical assistance in any case where a third party has a legal liability to make payments for such assistance, the State *has in effect laws* under which, to the extent that payment has been made under the State plan for medical assistance for health care items or services furnished to the individual, the State is considered to have acquired the rights of such individual to payment by any other party for such health care items or services.

42 U.S.C. § 1396a(a)(25)(H) (emphasis added). It is axiomatic that Congress does not express an intention to occupy an entire field in circumstances where it expressly conditions the receipt of federal financial assistance on participating states' enactment of conforming legislation designed to comply with a federal mandate. For this reason, the court's preemption analysis is

limited to the question whether Pennsylvania's implementation of Title XIX with respect to the issue of third-party liability conflicts with the anti-lien and anti-recovery provisions.

As the Supreme Court noted in *Ahlborn*, the anti-lien provision, read *literally* and in isolation, "would appear to ban even a lien on that portion of the settlement proceeds that represents payments for medical care." *Ahlborn*, 547 U.S. at 284. In a footnote, the Supreme Court observed that the anti-recovery provision "would appear to forestall any attempt by the State to recover benefits paid, at least from the 'individual.'" *Id.* at 284 n.13. The anti-lien provision contained in § 1396p(a)(1) provides that "[n]o lien may be imposed against the property of any individual prior to his death on account of medical assistance paid or to be paid on his behalf under the State plan, except . . . pursuant to the judgment of a court on account of benefits incorrectly paid on behalf of such individual," or on the real property of a Medicaid recipient under circumstances that are not relevant to this case. 42 U.S.C. § 1396p(a)(1)(A)-(B). The anti-recovery provision contained in § 1396p(b)(1) provides that "[n]o adjustment or recovery of any medical assistance correctly paid on behalf of an individual under the State plan may be made, except [under circumstances that are not pertinent to this case]." 42 U.S.C. § 1396p(b)(1). By its very terms, the anti-lien provision protects an individual's property only during his or her lifetime. The anti-recovery provision is not so limited. Nevertheless, the exceptions to the anti-recovery provision speak only in terms of recovery from an individual's estate, and only (1) after the death of his or her surviving spouse; and (2) when he or she has no surviving child who is either (a) under the age of 21; or (b) blind or disabled within the meaning of Title XVI of the Social Security Act. 42 U.S.C. § 1396p(b)(1)-(2).

The terms "lien" and "recovery," as used in Title XIX, are not coterminous. A lien is "a security device that binds property to a debt and puts a party on notice that someone besides the owner of the property has an interest in that property." *Nevada Dept. of Human Res. v. Estate of Ullmer*, 87 P.3d 1045, 1051 (Nev. 2004); BLACK'S LAW DICTIONARY 943 (8th ed. 2004) ("A legal right or interest that a creditor has in another's property, lasting usually until a debt or duty that it secures is satisfied."). In common parlance, the word "recovery" is defined as "the regaining of something lost or taken away." *Nevada Dept. of Human Res.*, 87 P.3d at 1051; BLACK'S LAW DICTIONARY 1302 (8th ed. 2004) ("The regaining or restoration of something lost or taken away."). Both the anti-lien provision and the anti-recovery provision evince a legislative intent to protect the personal property of medical assistance recipients from encroachment by state entities charged with the duty of administering the Medicaid program. There is no question that the liens placed on the settlement proceeds obtained by Tristani and Valenta constituted "liens" within the meaning of § 1396p(a)(1), and that the payments received by the DPW in satisfaction of those liens constituted "recoveries" within the meaning of § 1396p(b)(1), unless §§ 1396a(a)(25) and 1396k(a) carve exceptions into those statutory prohibitions.

A close examination of the statutory provisions allegedly creating the "exceptions" asserted by Richman and Houstoun indicates that Congress contemplated the commencement of direct actions by state entities against liable third parties for the cost of medical assistance furnished to Medicaid recipients. Section 1396a(a)(25)(A)(i)-(ii) requires a state plan for medical assistance to take all reasonable measures to provide for "the collection of sufficient information (as specified by the Secretary in regulations) to enable *the State to pursue claims against . . . third parties*," and to further provide for "the submission to the Secretary of a plan

(subject to approval by the Secretary) *for pursuing claims against such third parties*." 42 U.S.C. § 1396a(a)(25)(A)(i)-(ii). This statutory language unambiguously refers to direct actions by state entities against liable third parties. Section 1396a(a)(25)(B) requires a state to "seek reimbursement" from liable third parties for the cost of medical assistance provided to an individual "in any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement *the State can reasonably expect to recover exceeds the cost of such recovery*." 42 U.S.C. § 1396a(a)(25)(B) (emphasis added). The plain language of this statutory provision reveals that Congress believed that participating states would not only pursue liable third parties directly, but that they would also incur costs in seeking to recover their expenditures.

Under § 1396k(a)(1)(C), a state plan for medical assistance must provide that, as a condition of eligibility for medical assistance, an "individual is required . . . to cooperate with the State in identifying, and providing information *to assist the State in pursuing*, any third party who may be liable to pay for care and services available under the plan." 42 U.S.C. § 1396k(a)(1)(C) (emphasis added). This statutory language indicates that Congress expected participating states to need assistance in pursuing liable third parties. The reimbursement provision contained in § 1396k(b) likewise evinces a legislative intent that state entities directly pursue liable third parties. That provision requires a state entity which has collected money under an assignment to retain only those proceeds necessary to reimburse it and the federal government for the cost of a given Medicaid recipient's medical care, and to pay the remainder of the money to the recipient. 42 U.S.C. § 1396k(b). The reimbursement provision envisions an

active role in litigation by state entities, not the passive role played by the DPW in the cases involving Tristani and Valenta.

Title XIX also contains a provision providing for incentive payments to be made to states and political subdivisions which collect money under an assignment on behalf of a state. That provision, which is codified at 42 U.S.C. § 1396b(p), provides:

> **(p) Assignment of rights of payment; incentive payments for enforcement and collection**
>
> (1) When a political subdivision of a State makes, for the State of which it is a political subdivision, or one State makes, for another State, the enforcement and collection of rights of support or payment assigned under section [42 U.S.C. § 1396k], pursuant to a cooperative arrangement under such section (either within or outside of such State), there shall be paid to such political subdivision or such other State from amounts which would otherwise represent the Federal share of payments for medical assistance provided to the eligible individuals on whose behalf such enforcement and collection was made, an amount equal to 15 percent of any amount collected which is attributable to such rights of support or payment.
>
> (2) Where more than one jurisdiction is involved in such enforcement or collection, the amount of the incentive payment determined under paragraph (1) shall be allocated among the jurisdictions in a manner to be prescribed by the Secretary.

42 U.S.C. § 1396b(p). This scheme assumes that states and political subdivisions will incur costs in recovering payments from liable third parties, and that the incentives provided thereunder will help to offset those costs. *Cf. Wallace v. Estate of Jackson*, 972 P.2d 446, 452 (Utah 1998) (Durham, J., dissenting).

If the assignment provisions contained in §§ 1396a(a)(25) and 1396k(a) had been susceptible of only a construction which would carve exceptions into §§ 1396p(a)(1) and 1396p(b)(1), the court would have little trouble concluding that the anti-lien and anti-recovery provisions do not apply in situations involving reimbursement to state entities from awards

obtained by Medicaid recipients from liable third parties.  After all, it would be incongruous for a court to construe one statutory provision to prohibit something that is expressly authorized by a different provision contained within the same statutory scheme.  *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 n.7 (2003).  Sections 1396a(a)(25) and 1396k(a), however, can be reasonably construed (and are most naturally construed) to require an assignment for the purpose of enabling a participating state to directly pursue claims against third parties liable for the costs of providing medical assistance to Medicaid recipients.  This construction renders the assignment provisions consistent with (rather than contrary to) the anti-lien and anti-recovery provisions.

   Congress expressly enumerated exceptions to the anti-lien and anti-recovery provisions, and none of those exceptions indicate that the substantive prohibitions are inapplicable to third-party payments attributable to medical expenses incurred by the Medicaid program.  42 U.S.C. § 1396p(a)-(b).  "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."  *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980).  Richman and Houstoun point to no evidence which indicates that the anti-lien and anti-recovery provisions mean something other than what they say.  The anti-lien and anti-recovery provisions are unambiguous.  *Martin v. City of Rochester*, 642 N.W.2d 1, 12 (Minn. 2002).  Therefore, the court has no occasion to determine the degree of deference owed to any contrary opinions rendered by the DHHS.  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  The liens

imposed by the DPW against the settlement awards obtained by Tristani and Valenta contravened the anti-lien provision, and the payments extracted from Tristani and Valenta by the DPW contravened the anti-recovery provision.

The court has already determined that the portions of the settlement awards paid to the DPW were attributable to medical expenses incurred by the Medicaid program, and that neither Tristani nor Valenta can establish an "*Ahlborn* violation." In *Martin v. City of Rochester*, 642 N.W.2d 1, 14-15 (Minn. 2002), the Minnesota Supreme Court opined that the anti-lien provision was not implicated by a lien imposed only on the portion of a settlement award attributable to payments made by the Medicaid program to provide medical care to an eligible recipient. The Minnesota Supreme Court explained:

> It is critical to note that the federal scheme reflects the concept that the assigned right to recover for medical expenses is no longer the property of the medical assistance recipient and therefore the anti-lien provision does not prohibit a state from pursuing recovery under this assigned right. Essentially, at the time of the accident, the injured party acquires in tort one or more rights of action or claims against those responsible for the injuries. These rights of actions or claims can be likened to a "bundle of sticks." See *United States v. Ben-Hur*, 20 F.3d 313, 317-18 (7th Cir. 1994) (stating that property rights are likened to "bundle of sticks," each stick separately alienable); *In re Nelson*, 92 B.R. 837, 842 (Bankr.D.Minn. 1988) (reflecting the implicit concept that property rights are divisible). As a condition of receiving medical assistance from a state, a medical assistance recipient assigns to the state one stick from that bundle–the specific claim to recover medical expenses from those responsible for the injuries. At this point, the state becomes the sole owner of the claim against any third parties for medical expenses. But the recipient retains ownership of the remaining sticks in the bundle–that is to say, the claims for pain and suffering, emotional distress, disability, disfigurement, loss of earnings, and loss of earning capacity. To the extent that any settlement with the responsible third parties is for this larger bundle of sticks (the original tort action minus the claim for medical care), the settlement proceeds are the recipient's property, and as such are protected by the federal anti-lien provision.

*Martin*, 642 N.W.2d at 14-15.  If the reasoning in *Martin* were to be applied in this case, there would be no violation of the anti-lien provision.  That provision prohibits only the imposition of a lien on the *property* of a Medicaid recipient.  42 U.S.C. § 1396p(a)(1).  By virtue of Pennsylvania's default allocation rule, the settlement proceeds that were subject to the DPW's liens were attributable to payments made by the DPW to provide medical assistance to Tristani and Valenta.  The critical question is whether those portions of the settlement awards were the "property" of Tristani and Valenta at the time of the imposition of the liens.  A close examination of *Ahlborn* reveals that this question must be answered in the affirmative.

In *Ahlborn*, Arkansas argued that the settlement proceeds subject to the state's lien were not the "property" of the Medicaid recipient who had secured a settlement award.  The Supreme Court rejected this argument for two reasons.  Under Arkansas law, the recipient "at all times until judgment [had] retained her entire chose in action–a right that *included her claim for medical damages*."  *Ahlborn*, 547 U.S. at 285 (emphasis added).  The Supreme Court reasoned that since the recipient had been able to sue the third-party defendants in her own right, the statutory lien could not have attached until the settlement proceeds had materialized.  *Id.*  At that point, the proceeds had already become the property of the Medicaid recipient.  *Id.*  In addition, the Supreme Court declared that since "[a] lien typically is imposed on the property of *another* for payment of a debt owed by that other," it made no sense for Arkansas to claim that it had imposed a lien on its own property.  *Id.* at 286 (emphasis in original).

The instant case is indistinguishable from *Ahlborn* in both respects.  It is clear that, under Pennsylvania law, Tristani and Valenta retained the ability to pursue payments (i.e., damages or proceeds available under insurance policies) from responsible third parties, and that such

payments included proceeds attributable to expenditures incurred by the Medicaid program to provide medical assistance to these two individuals. Even in the aftermath of the latest statutory revision implemented by the Pennsylvania legislature, Pennsylvania law permits a Medicaid recipient to include medical expenses paid for by the Medicaid program within his or her claim against a liable third party. 62 PA. STAT. ANN. § 1409(b)(5)(vi). Although the DPW had the option of commencing its own actions against the liable third parties to reimburse itself for the expenditures incurred in providing medical assistance to Tristani and Valenta, these two individuals never lost the option of including those expenditures within their own claims. Consequently, the liens imposed on their settlement proceeds were placed on their "property" for purposes of the anti-lien provision. *Ahlborn*, 547 U.S. at 285 ("The statutory lien, then, cannot have attached until the proceeds materialized."). Moreover, the mere fact that the DPW needed to assert liens in the first place indicates that the liens were imposed on the "property" of Tristani and Valenta. *Id.* at 286 ("Why, after all, would ADHS need a lien on its own property?"). Under these circumstances, it is clear that the liens imposed by the DPW on the settlement proceeds obtained by Tristani and Valenta were in violation of § 1396p(a)(1).[17]

The court's determination that the DPW violated the rights enjoyed by Tristani and Valenta under §§ 1396p(a)(1) and 1396p(b)(1) is consistent with the reasoning articulated by Associate Chief Justice Durham of the Utah Supreme Court in her dissenting opinion in *Wallace*

---

[17]Richman and Houstoun rely on the decision of the United States Court of Appeals for the Eighth Circuit in *Northwest Bank of North Dakota, N.A. v. Doth*, 159 F.3d 328 (8th Cir. 1998), for the proposition that Congress has clearly expressed its intention to permit state entities like the DPW to impose liens on settlement awards obtained by Medicaid recipients from liable third parties. In *Doth*, the court of appeals actually declined to address the question whether Title XIX required state entities to pursue liable third parties in direct actions instead of imposing liens on the judgment or settlement awards obtained by Medicaid beneficiaries. *Doth*, 159 F.3d at 334. Therefore, *Doth* does not provide support for the arguments advanced by Richman and Houstoun in this case.

*v. Estate of Jackson*, 972 P.2d 446 (Utah 1998).  The United States Supreme Court briefly made reference to Justice Durham's opinion in *Ahlborn*, indicating that the issues discussed therein were simply being left "for another day."  *Ahlborn*, 547 U.S. at 284 n.13.  That day has not arrived in the Supreme Court, but it has arrived for the litigants in this court.  The DPW was not entitled to the "free ride" that it enjoyed with respect to the payments extracted from Tristani and Valenta.  *Wallace*, 972 P.2d at 452 (Durham, J., dissenting).  The DPW was free to intervene in the Tristani and Valenta cases.  By virtue of the assignments, the DPW was able to represent directly its own interests.  *Id.* at 451 (Durham, J., dissenting).  Having failed to do so, the DPW was not entitled to impose liens on the settlement proceeds obtained by Tristani and Valenta, or to seek adjustments or recoveries from such proceeds for "medical assistance correctly paid" on their behalf, under circumstances not within the exceptions to the anti-lien and anti-recovery prohibitions specifically enumerated in §§ 1396p(a)(1) and 1396p(b)(1).

To the extent that sections 1409(b)(7)(i) and 1409.1(b)(1) permit the DPW to impose liens on the awards obtained by Medicaid recipients from liable third parties during the lifetimes of the recipients, they are preempted by § 1396p(a)(1).  To the extent that sections 1409(b)(7)(i) and 1409.1(b)(1) permit the DPW to seek adjustments or recoveries of "medical assistance correctly paid" under circumstances not within the exceptions enumerated within the federal statute, they are preempted by § 1396p(b)(1).  The application of section 1409(b)(7)(i) to the settlement proceeds secured by Tristani and Valenta was unconstitutional under the Supremacy Clause.

The DPW, however, is not without a means to secure its interest in recouping its expenses from liable third parties.  There is a long line of authority holding that where Congress does not

express an intention to preempt all state regulation of a given matter, state laws are preempted only insofar as they are in conflict with the supreme law of the land. *De Canas v. Bica*, 424 U.S. 351, 357-58 n.5 (1976); *Tousley v. North American Van Lines, Inc.*, 752 F.2d 96, 102 (4th Cir. 1985); *Chevron U.S.A., Inc. v. Hammond*, 726 F.2d 483, 496 (9th Cir. 1984); *Illinois v. Kerr-McGee Chem. Corp.*, 677 F.2d 571, 579 (7th Cir. 1982); *North Dakota v. Merchs. Nat'l Bank & Trust Co.*, 634 F.2d 368, 382 (8th Cir. 1980); *Amalgamated Transit Union v. Byrne*, 568 F.2d 1025, 1029 n.3 (3d Cir. 1977); *Kargman v. Sullivan*, 552 F.2d 2, 13 (1st Cir. 1977); *Texas Oil & Gas Corp. v. Phillips Petroleum Co.*, 406 F.2d 1303, 1304-05 (10th Cir. 1969); *Permobil, Inc. v. Am. Express Travel Related Servs. Co., Inc.*, 571 F.Supp.2d 825, 838 (M.D.Tenn. 2008); *Munday v. Waste Mgmt. of N. Am., Inc.*, 997 F.Supp. 681, 684 (D.Md. 1998).

Pennsylvania law requires a Medicaid beneficiary to "provide reasonable notice" to the DPW when he or she commences an action or claim seeking the recovery of medical expenses incurred by the Medicaid program for his or her benefit. 62 PA. STAT. ANN. § 1409(b)(5)(iii). Notice is deemed to be "reasonable" where it allows the DPW "sufficient time to petition to intervene in the action and prosecute its claim." *Id.* Pennsylvania law also permits the DPW to become a party to an action brought by a Medicaid beneficiary against a third-party tortfeasor or insurer. 62 PA. STAT. ANN. § 1409(b)(5)(v). The DPW remains free to assert its own interests in accordance with Pennsylvania law without violating §§ 1396p(a)(1) and 1396p(b)(1). *Wallace*, 972 P.2d at 451 (Durham, J., dissenting) (explaining that because a *potential* settlement award is not yet the property of the plaintiff, it can be subject to a state-imposed lien, and that a state entity can avoid the strictures of §§ 1396p(a)(1) and 1396p(b)(1) by intervening in a case and representing its own interests under the assignment). The court holds only that the assignment

provisions of Title XIX do not provide the DPW with a license to ignore the clear, unambiguous mandates of the anti-lien and anti-recovery provisions when the DPW chooses to remain on the sidelines in actions commenced by Medicaid beneficiaries against liable third parties.

Given the foregoing analysis, it is clear that the DPW violated the rights enjoyed by Tristani and Valenta under §§ 1396p(a)(1) and 1396p(b)(1). It remains to be determined whether Richman and Houstoun are entitled to qualified immunity. The court will proceed to address the merits of the remaining claims asserted by Tristani and Valenta before determining whether Richman and Houstoun can avail themselves of the qualified immunity defense in this case.

## E.      The Constitutional Claims

Tristani and Valenta allege that Richman and Houstoun violated their rights under the Fifth and Fourteenth Amendments to the United States Constitution, as well as article I, section 10, of the Pennsylvania Constitution. These claims are based on the Takings Clauses of the Fifth Amendment and the Pennsylvania Constitution, as well as on the Due Process Clause of the Fourteenth Amendment. The court will address the merits of those claims.

## 1.      The Federal Constitutional Claims

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Claims arising under this constitutional provision can take various forms. While the text of the Due Process Clause focuses on the "process" by which a person can be lawfully deprived of a constitutionally protected liberty or property interest, the Supreme Court has made it clear that the constitutional provision bars certain governmental actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). The Due

Process Clause has been construed to incorporate some of the specific provisions contained in the Bill of Rights, thereby making them applicable to the states. *Albright v. Oliver*, 510 U.S. 266, 272-75 (1994)(plurality opinion). The Due Process Clause has also been construed to provide "heightened protection against governmental interference with certain fundamental rights and liberty interests," and to prohibit the government from employing its power "as an instrument of oppression." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). Finally, the Due Process Clause has been construed, in accordance with its express terms, to prohibit otherwise permissible deprivations of liberty or property in the absence of appropriate procedural protections. *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972).

Tristani and Valenta assert claims falling within each of these three general categories. The Takings Clause of the Fifth Amendment is applicable to the states by virtue of the Due Process Clause of the Fourteenth Amendment. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980). Tristani and Valenta assert claims under the Takings Clause. They assert more generalized "substantive due process" claims. In addition, they assert claims based upon the theory of "procedural due process." Each of these distinct theories of liability will be separately discussed.

a.      **The Takings Clause Claims**

Tristani and Valenta allege that the DPW violated their rights under the Takings Clause by collecting portions of their settlement awards. The Takings Clause prohibits the government from taking "private property" for "public use" without providing "just compensation" to the owner. U.S. CONST. amend. V. The parties have not gone to great pains to brief the Takings Clause issue, making it somewhat difficult for the court to ascertain the precise legal theory upon

72

which Tristani and Valenta rely. Specifically, it is not entirely clear to the court whether the allegedly uncompensated "takings" involved only the unspecified portions of the settlement awards which Tristani and Valenta believe to not have been attributable to medical expenses incurred by the DPW for their benefit, or whether they involved the entire amounts collected by the DPW from these two individuals. In any event, the court concludes that these claims are without merit regardless whether they involve the entire amounts of the settlement awards or only the portions hypothetically allocated to Medicaid-financed medical expenditures.

Richman and Houstoun contend that the Takings Clause claims asserted against them are barred by the Eleventh Amendment. In support of their argument, they rely on *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948 (9th Cir. 2008). In *Seven Up Pete Venture*, the United States Court of Appeals for the Ninth Circuit held that "the Eleventh Amendment bars reverse condemnation actions brought in federal court against state officials in their official capacities." *Id.* at 956. The court of appeals refused to recognize "the constitutionally grounded self-executing nature of the Takings Clause" as an exception to "the conventional application of the Eleventh Amendment." *Id.* at 954. The court of appeals did *not* hold that all Takings Clause cases are *ipso facto* barred by the Eleventh Amendment. The holding in *Seven Up Pete Venture* was simply a "conventional application" of general Eleventh Amendment principles in the Takings Clause context.

Tristani and Valenta make it clear that their Takings Clause claims against Richman and Houstoun are "personal capacity" claims. In *Kentucky v. Graham*, 473 U.S. 159 (1985), the Supreme Court made the following observations:

> A victory in a personal-capacity action is a victory against the individual
> defendant, rather than against the entity that employs him. Indeed, unless a
> distinct cause of action is asserted against the entity itself, the entity is not even a
> party to a personal-capacity lawsuit and has no opportunity to present a defense.

*Graham*, 473 U.S. at 167-68. A "personal-capacity" action of the kind described in *Graham*

must be distinguished from an "official-capacity" action. A public official sued in his or her

official capacity assumes the identity of his or her employer (which, in the case of Richman, is

the Commonwealth of Pennsylvania). *Hafer v. Melo*, 502 U.S. 21, 27 (1991). The Eleventh

Amendment does not bar "personal-capacity" suits against state officials.[18] *Id.* at 30-31. Thus,

the "conventional application" of Eleventh Amendment principles in this case compels the

conclusion that the personal-capacity claims against Richman and Houstoun under the Takings

Clause are *not* barred by the Eleventh Amendment. The apparent belief of Richman and

Houstoun to the contrary is in error.

Richman and Houstoun also argue that the Takings Clause claims asserted against them

are unripe. The Takings Clause does not categorically proscribe the governmental taking of

private property for public use. Instead, it merely requires the government to pay "just

---

[18]When Congress acts pursuant to its authority under § 5 of the Fourteenth Amendment, it can abrogate a state's Eleventh Amendment immunity. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Since such an abrogation dramatically alters the relationship between the federal government and the state (or states) in question, the Supreme Court has held that an abrogation of Eleventh Amendment immunity will be found only where Congress has made its intent to abrogate "unmistakably clear" in the relevant statutory language. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242 (1985). Section 1983 does not contain such "unmistakably clear" language. The Supreme Court has held that a state is not a "person" subject to suit under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Since an "official-capacity" suit against a state official is indistinguishable from a suit against the state itself, a public official sued in his or her official capacity is not a "person" within the meaning of § 1983. *Id.* State officials sued in their "personal capacities," however, are "persons" within the meaning of § 1983. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). "Personal-capacity" suits against state officials are not barred by the Eleventh Amendment. *Id.* Whether a state (or a state official sued in his or her official capacity) is a "person" for purposes of § 1983 is a separate question from whether the state (or the state official sued in his or her official capacity) is entitled to Eleventh Amendment immunity. The Supreme Court has construed § 1983 in conformity with (rather than as an exception to) the Eleventh Amendment, since it has not read that statute as an abrogation of the states' Eleventh Amendment immunity. *Id.* at 30-31.

compensation" to the owner for the "private property" taken for the public welfare. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985). A plaintiff has no claim under the Takings Clause if he or she has an opportunity to obtain "just compensation" by means of procedures established by the state. *Chainey v. Street*, 523 F.3d 200, 223 (3d Cir. 2008). Richman and Houstoun contend that procedures for obtaining "just compensation" were available under Pennsylvania law, and that Tristani and Valenta failed to avail themselves of those procedures. This argument is difficult to evaluate because it is not entirely clear whether Tristani and Valenta believe that they should receive "compensation" for the entire amounts collected from their settlement awards by the DPW, or only for the hypothetical amounts allegedly attributable to damages other than expenses incurred by the Medicaid program. The court need not reach this argument because the Takings Clause claims at issue in this case are clearly lacking in merit even if it is assumed that no procedures are available under Pennsylvania law through which Tristani and Valenta can obtain "just compensation."

The general principles derived from *Ahlborn* are unique to Title XIX. They are not applicable in every conceivably analogous context. *See Admin. Comm. for Wal-Mart Stores, Inc. v. Salazar*, 525 F. Supp. 2d 1103, 1115 (D. Ariz. 2007) (holding that *Ahlborn* was not applicable to ERISA disputes). It would be a mistake for one to assume that the DPW violated the United States Constitution simply *because* it violated the anti-lien and anti-recovery provisions of Title XIX. Even though the DPW's actions ran afoul of §§ 1396p(a)(1) and 1396p(b)(1), they did not violate the Takings Clause. It is undisputed that, regardless whether the DPW was statutorily entitled to reimburse itself in the manner in which it did, the DPW collected no more money from Tristani and Valenta than it had already spent for their benefit. It is arguable that such

collections did not constitute "takings" requiring just compensation in the first place. *United States v. Sperry Corp.*, 493 U.S. 52, 63 (1989) (stating that "a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services"); *Parker v. Barnhart*, 174 F. Supp. 2d 920, 941 (N.D. Iowa 2001)(observing that the government is not constitutionally required to provide "compensation" when it simply collects "a fair approximation of the cost of the benefits supplied" to a plaintiff). Even if it is assumed *arguendo* that takings have occurred, it is difficult to fathom how Tristani and Valenta believe that they have not received "just compensation." Every penny that they paid to the DPW has been accounted for in terms of medical assistance provided under the Medicaid program. *Richards v. Georgia Dep't of Cmty. Health*, 604 S.E.2d 815, 820 (Ga. 2004).

The Takings Clause does not categorically prohibit the taking of private property for a public use, "but instead places a condition on the exercise of that power." *First Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987). The Supreme Court has repeatedly emphasized that the purpose of the Takings Clause is to bar the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 336 (2002) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Tristani and Valenta cannot reasonably argue that, "in all fairness and justice," the cost of their medical care "should be borne by the public as a whole." As a condition of eligibility for medical assistance under Title XIX, Tristani and Valenta were required to assign to the DPW their right "to payment for medical care from any third party." 42 U.S.C. § 1396k(a)(1)(A). The scheme is particularly designed to ensure that a state entity such as the DPW cannot obtain a

windfall.  Any excess amount recovered by a state entity from a liable third party (i.e., an amount remaining after a state entity has reimbursed itself and the federal government) must be paid to the Medicaid beneficiary.  42 U.S.C. § 1396k(b).

The collection mechanism ensures that a medical assistance recipient loses his or her right to payment only for the medical assistance for which he or she has *not* paid.  *Holloran*, 637 A.2d at 321 ("But the Hollorans do not need to recover the medical expenses in question to make themselves whole, because they never paid them.  Allowing the Hollorans to obtain double recovery, when they have the best opportunity which our legal system provides to recover all damages properly due them, would be classic unjust enrichment.").  Tristani and Valenta were not compelled to apply for medical assistance.  They made voluntary choices to do so.  Having received in the form of medical assistance the full value of the money taken from their settlement awards, Tristani and Valenta cannot reasonably contend that the DPW has effected *uncompensated* takings in violation of the Fifth and Fourteenth Amendments.[19]  The Takings

---

[19]The DPW was free to intervene in the actions commenced by Tristani and Valenta in order to assert its own interests.  Had it done so, it would have been able to obtain the same amounts from the settlement awards that it obtained by way of the liens at issue in this case.  While the DPW's *manner* of collection is relevant to the question whether §§ 1396p(a)(1) and 1396p(b)(1) have been violated, it does not impact the Takings Clause inquiry.  In *United States v. Sperry Corp.*, 493 U.S. 52 (1989), the Supreme Court observed:

> It is artificial to view deductions of a percentage of a monetary award as physical appropriations of property.  Unlike real or personal property, money is fungible.  No special constitutional importance attaches to the fact that the Government deducted its charge directly from the award rather than requiring Sperry to pay it separately.  If the deduction in this case were a physical occupation requiring just compensation, so would be any fee for services, including a filing fee that must be paid in advance.

*Sperry Corp.*, 493 U.S. at 62 n.9.  Given the Supreme Court's language in *Sperry Corp.*, it is clear that Tristani and Valenta cannot establish Takings Clause violations in this case.

Clause claims asserted by Tristani and Valenta are without merit, and Richman and Houstoun are entitled to summary judgment with respect to those claims.[20]

**b.      The Substantive Due Process Claims**

Tristani and Valenta also assert substantive due process claims against Richman and Houstoun.  The Supreme Court has admonished that courts should generally be reluctant to expand the concept of substantive due process, since "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S. at 125.  "Substantive due process claims against executive officials are analyzed differently than substantive due process challenges to legislative enactments." *Taylor v. Altoona Area Sch. Dist.*, 513 F. Supp. 2d 540, 565 (W.D. Pa. 2007).  In a challenge to a legislative enactment, a reviewing court must first determine whether the challenged enactment implicates a "fundamental right." *Glucksberg*, 521 U.S. at 722.  If a fundamental right is infringed, the enactment can be upheld only if it is narrowly tailored to secure a *compelling* governmental interest. *Id.* at 721.  If the enactment does not implicate a fundamental right, it need only be rationally (or reasonably) related to a *legitimate* governmental interest. *Id.* at 722.  On the other hand, "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

------

[20]The court has no occasion to consider whether the DPW's practice of collecting the amounts of the expenditures of an MCO, rather than the amounts of the capitation fees paid to that MCO for a particular Medicaid recipient's benefit, is violative of the Takings Clause.  As noted earlier, none of Tristani's medical assistance was provided through an MCO, and the amount of money spent by an MCO for Valenta's benefit was less than the amount of the capitation fees paid by the DPW to the MCO.  Consequently, there is no need for the court to tackle the Takings Clause issue from that angle.

Although this court determined that sections 1409(b)(7)(i) and 1409.1(b)(1) cannot be constitutionally applied to the extent that they authorize "liens" and "recoveries" prohibited by §§ 1396p(a)(1) and 1396p(b)(1), it has done so only on Supremacy Clause grounds. Pennsylvania's implementation of its responsibilities under Title XIX infringes no fundamental rights of Medicaid recipients, nor is it lacking a rational basis. If Congress were to repeal the federal anti-lien and anti-recovery provisions, Pennsylvania's statutory scheme would clearly be constitutional. The court does not understand Tristani and Valenta to argue otherwise. The substantive due process claims in this case are properly classified as challenges to the executive actions taken by Richman and Houstoun. In order to prevail in such claims, Tristani and Valenta must show that the actions of Richman and Houstoun were conscience-shocking. *Id.*

As the Supreme Court explained in *County of Sacramento v. Lewis*, the conscience-shocking concept "duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848. "At one end of the spectrum is negligence, which is categorically insufficient to constitute conscience-shocking conduct for purposes of the Due Process Clause." *Taylor*, 513 F. Supp. 2d at 565. The Supreme Court has made it clear that the Due Process Clause does not require a state to "guarantee due care on the part of its officials." *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). At the opposite end of the spectrum is conduct intended to cause unwarranted injury. *Taylor*, 513 F. Supp. 2d at 565. "[C]onduct intended to injure in some way unjustifiable by any governmental interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. "Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range,

following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls." *Id.*

In this case, Tristani and Valenta do not clearly articulate the level of culpability that they believe to be applicable to the actions of Richman and Houstoun. Plaintiffs also do not make any allegations of evil or malicious intent on the part of defendants. Instead, they rely on *Phillips v. County of Allegheny*, 515 F.3d 224, 242 (3d Cir. 2008), for the proposition that the "conscience-shocking" inquiry focuses solely on the action in question and not on the state of mind of the relevant state actor, and they contend that motive is not an issue in this case. Even assuming *arguendo* bad faith on the part of defendants, the court can not conclude that defendants' conduct shocks the conscience.

To do so would run counter to the principle that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Lewis,* 523 U.S. at 846 (internal quotation marks omitted). A plaintiff cannot establish a violation of the Due Process Clause simply by showing that a state actor has violated a statutory proscription. *United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 402 (3d Cir. 2003). Bad faith enforcement of an invalid state statute does not automatically violate the Due Process Clause. *Corneal v. Jackson Twp.*, 313 F. Supp. 2d 457, 466 (M.D. Pa. 2003). So long as a governmental decision is rationally related to a legitimate state interest, no substantive due process violation occurs even if the governmental entity exceeds the scope of its jurisdiction. *Id.* Absent governmental action that is truly irrational, a statutory violation cannot be fairly characterized as a substantive due process violation. *Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104-05 (8th Cir. 1992) ("Our decision would be the same even if the City had knowingly enforced the invalid

zoning ordinance in bad faith and had no claim that St. Louis County zoning applied to the property.  A bad-faith violation of state law remains only a violation of state law.").

In this case, the only basis that Tristani and Valenta have for asserting substantive due process claims is the DPW's invalid implementation of section 1409(b)(7)(i).  Richman and Houstoun sought to recoup what the DPW had expended on behalf of Tristani and Valenta.  Conduct of this kind simply cannot be properly characterized as "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Lewis*, 523 U.S. at 847 n.8.  While DPW may have violated §§ 1396p(a)(1) and 1396p(b)(1), it did not violate the Due Process Clause.  Richman and Houstoun are entitled to summary judgment with respect to the substantive due process claims asserted by Tristani and Valenta.

**c.      The Procedural Due Process Claims**

Tristani and Valenta contend that the DPW violated their procedural due process rights by collecting portions of their settlement awards without providing them with the opportunity to challenge the validity or amounts of the liens at issue.  At the outset, the court notes that "the range of interests protected by procedural due process is not infinite."  *Bd. of Regents v. Roth*, 408 U.S. 564, 570 (1972).  "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."  *Id.* at 569.  Since Pennsylvania law permitted Tristani and Valenta to recover the entire amounts of their damages (including the amounts of payments made by the DPW to provide them with medical assistance), the entire settlement awards were their "property."  *Ahlborn*, 547 U.S. at 285.  Consequently, Tristani and Valenta had constitutionally protected

81

property interests in their settlement awards. *Andree v. County of Nassau*, 311 F. Supp. 2d 325, 335 (E.D.N.Y. 2004).

The next question for consideration is whether Tristani and Valenta were "deprived" of their property within the meaning of the Due Process Clause. If they had made payments to satisfy the liens on a voluntary basis, they would have been unable to establish the existence of "deprivations." *Zinermon v. Burch*, 494 U.S. 113, 117 n.3 (1990) ("If only those patients who are competent to consent to admission are allowed to sign themselves in as 'voluntary' patients, then they would not be deprived of any liberty interest at all."). The attorneys for Tristani and Valenta received written notices that, under Pennsylvania law, anyone who failed to honor the DPW's rights under section 1409 could face criminal and civil penalties. (Defs' Summ. J. App. 1A, 84A.) They testified that they took representations made by the DPW at face value, and that the payments made to the DPW were mandatory. (*Id.* 60A, 118A-19A.) Hence, the court concludes that Tristani and Valenta were "deprived" of their property for purposes of the Fourteenth Amendment.[21]

_____

[21]Richman and Houstoun contend that the claims asserted by Tristani and Valenta are barred by the voluntary payment doctrine. That issue can be disposed of on the ground that the payments made in satisfaction of the liens at issue were not voluntary. Under the voluntary payment doctrine, an individual generally cannot recover a payment made in satisfaction of an illegal demand for payment where he or she had full knowledge of the facts rendering the demand illegal at the time of payment. *Air Espana v. Brien*, 165 F.3d 148, 153-54 (2d Cir. 1999). Some courts have opined that the doctrine is applicable where an individual satisfies an illegal demand for payment because of a mistake of *law* rather than because of a mistake of *fact*. *Acme Markets, Inc. v. Valley View Shopping Ctr., Inc.*, 493 A.2d 736, 737 (Pa. Super. Ct. 1985). In *Doran v. Missouri Department of Social Services*, Civil Action No. 07-4158, 2008 U.S. Dist. LEXIS 66772, at **19-20 (W.D. Mo. Sept. 2, 2008), the United States District Court for the Western District of Missouri determined that a payment cannot be characterized as "voluntary" if it is made only because of an inaccurate understanding of the law. *Doran*, 2008 U.S. Dist. LEXIS 66772, at *19 ("As medicaid recipients, Plaintiffs should not be burdened with the responsibility of recognizing a violation of the Federal Anti-Lien Statute, a somewhat technical statute not readily known or understood by laypeople."). This line of reasoning makes the *fact of illegality* one of the "facts" which must be appreciated by an individual in order to render his or her payment "voluntary." In this case, it is undisputed that Tristani and Valenta were unaware of the protections that they enjoyed under the anti-lien and anti-recovery provisions. The court finds the reasoning in *Doran* to be persuasive. The claims asserted by Tristani and Valenta are not precluded by the "voluntary payment" doctrine.

It remains to be determined whether the "deprivations" suffered by Tristani and Valenta were occasioned "without due process of law." The Due Process Clause "raises no impenetrable barrier to the taking of a person's possessions." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). What is unconstitutional, in this context, is not a deprivation of property itself, but a deprivation of property *without due process of law*. *Zinermon*, 494 U.S. at 125. The essential requirements of the Due Process Clause are notice and an opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-548 (1985). The standard for determining what process is due in a given situation is rather flexible, since the due process inquiry eschews reliance on rigid mandates in favor of an approach which accounts for the factual circumstances of the particular situation at issue. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). In *Matthews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court described the factors that must be considered as a part of this inquiry. The Supreme Court explained:

> More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews*, 424 U.S. at 334-35. Where feasible, the Constitution usually requires a hearing before a state deprives a person of a constitutionally-protected property interest. *Zinermon*, 494 U.S. at 127.

In circumstances where a deprivation is occasioned by an unauthorized, random act of a state employee, and not by an established state procedure, the Due Process Clause is satisfied by

the availability of an adequate postdeprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). A state cannot be expected to do the impossible by employing predeprivation procedures prior to every unauthorized action taken by a state employee. Where a "deprivation" is caused by the random action of a state employee, "the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." *Id.* The appropriate level of process required by the Fourteenth Amendment in connection with a particular deprivation of property often depends upon whether the deprivation in question was authorized or unauthorized under the relevant state's established procedures.

In this case, the deprivations at issue were carried out pursuant to established state procedures. Under those circumstances, it cannot be assumed that the availability of postdeprivation relief would be sufficient to satisfy the Constitution. *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) ("When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due process."). A meaningful opportunity to challenge a lien before its imposition, however, satisfies the Due Process Clause.[22] *Colondres v. Scoppetta*, 290 F. Supp. 2d 376, 383 (E.D.N.Y. 2003).

Richman and Houstoun argue that Tristani and Valenta failed to avail themselves of the postdeprivation remedies available under Pennsylvania law and, hence, cannot establish procedural due process violations. Specifically, they point to the availability of a hearing with

---

[22]In *Richards v. Georgia Department of Community Health*, 604 S.E.2d 815, 820 (Ga. 2004), the Georgia Supreme Court held that a Medicaid recipient waives his or her due process rights with respect to a judgment or settlement award by accepting medical assistance and agreeing to the assignment required under §§ 1396a(a)(25)(H) and 1396k(a)(1)(A). The court does not reach the issue of waiver in this case because it is clear that, even in the absence of waivers by Tristani and Valenta, no procedural due process violations can be established.

the DPW's Bureau of Hearings and Appeals for "[o]verpayment and reimbursement claims,"
which is available for claims challenging either the computation of the *amount* of a claim or the
collection *procedures* at issue. 55 PA. CODE § 275.1(a)(4)(i)(F). In addition, they point out that
72 PA STAT. ANN. § 503(a) permits an aggrieved individual to seek reimbursement from
Pennsylvania's Board of Finance and Revenue. This argument erroneously presupposes that one
must invariably avail himself or herself of any available postdeprivation remedies prior to
commencing an action under § 1983 for a procedural due process violation.

It is true that an aggrieved individual must take advantage of his or her postdeprivation
remedies before suing in circumstances where the Due Process Clause does not require
predeprivation process.[23] *See Reilly v. City of Atlantic City*, 532 F.3d 216, 234-35 (3d Cir. 2008)
(concluding that plaintiff can not claim deprivation of due process, because plaintiff abandoned
the post-deprivation process). That is because the *process* that is *due* (i.e., postdeprivation
process) satisfies the applicable constitutional requirement, thereby precluding a plaintiff who
has failed to avail himself or herself of that process from establishing a deprivation of property
"without due process of law." It is important to note, however, that one's pursuit of
postdeprivation remedies in that situation should not be confused with administrative exhaustion

---

[23]In *McDaniels v. Flick*, 59 F.3d 446 (3d Cir. 1995), the United States Court of Appeals for the Third
Circuit held that "a discharged employee cannot claim in federal court that he has been denied due process because
his pretermination hearing was held by a biased individual where he has not taken advantage of his right to a post-
deprivation hearing before an impartial tribunal that can rectify any possible wrong committed by the initial
decisionmaker." *McDaniels*, 59 F.3d at 460. This holding, however, was based on the premise that an impartial
decisionmaker was not constitutionally required at the pretermination stage. *Id.* at 459-60. Whether an aggrieved
individual must pursue postdeprivation remedies before commencing an action for an alleged procedural due process
violation turns on whether such remedies can cure the underlying constitutional infirmity. In circumstances where
predeprivation process is required but not provided, a procedural due process violation can be established as soon as
the deprivation in question occurs. *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008)
("Our first task, then, is to determine whether the Town was faced with circumstances in which it was required to
provide a predeprivation hearing. If so, then no amount of postdeprivation process could cure the Town's initial
failure to provide a hearing.").

requirements that exist in other contexts. *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

Section 1983 contains no exhaustion requirement. *Patsy v. Board of Regents*, 457 U.S. 496, 500-01 (1982).

Resort to postdeprivation procedures is required only where it is necessary to establish an underlying procedural due process violation. Where predeprivation process is constitutionally required but not provided, "no amount of postdeprivation process" can cure an otherwise infirm deprivation. *Alvin*, 227 F.3d at 120. Because Richman and Houstoun cannot establish (and do not even appear to argue) that the DPW was faced with circumstances in which predeprivation procedures were not constitutionally required, they cannot defeat the procedural due process claims asserted by Tristani and Valenta solely on the basis of the failure of these two individuals to avail themselves of the postdeprivation procedures available under Pennsylvania law. *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 n.3 (3d Cir. 2008) ("Thus, concluding that a predeprivation hearing was required made summary judgment in favor of the Town not available when that judgment was based on the Club's failure to avail itself of postdeprivation remedies.").

The other argument made by Richman and Houstoun is based on the argument that Tristani and Valenta could have challenged the DPW's liens in their pending court actions against the liable third parties. This argument has merit. The plain language of section 1409(b)(7)(i) contemplates judicial involvement in the DPW's collection process. It is apparent that a Medicaid recipient is free to challenge the validity of a lien asserted by the DPW within the context of an existing court action against a liable third party. *Bowmaster*, 933 A.2d at 87-92. By virtue of the Supremacy Clause, a Pennsylvania court is required to treat federal law as a part

of Pennsylvania law. *Arres v. IMI Cornelius Remcor, Inc.*, 333 F.3d 812, 814 (7th Cir. 2003) ("This follows from the principle that federal law is the law of the states. The Supremacy Clause of the federal Constitution requires Illinois to treat federal law as part of state law.").

Tristani and Valenta were free to raise their arguments concerning Title XIX's anti-lien and anti-recovery provisions before the Pennsylvania courts. The undisputed evidence of record indicates that neither Tristani nor Valenta believed the DPW's liens to be illegal, and that the payments were made to the DPW without protest. (Defs' Summ. J. App. 60A, 118A-119A.) Tristani entered into a settlement agreement which provided for the payment of $148,508.99 to the DPW. (*Id.* 36A.) The court acknowledges that Valenta made his $10,000.00 payment to the DPW before commencing his action against Patil and Morris. (*Id.* 90A-93A.) The payment was apparently made because Valenta had no intention of refuting the DPW's claim. Had he wished to contest the validity of the lien, there is no reason to assume that he could not have done so in the Pennsylvania Court of Common Pleas of Allegheny County. The documentary evidence indicates that Valenta not only acquiesced in the DPW's lien, but that he also may have obtained more money from a third-party insurer than he would have had the lien not been imposed. (*Id.* 94A-95A.) Valenta's attorney testified that he had not attempted to enter into negotiations with the DPW concerning the validity or amount of the lien, and that he had not been under the impression that there was anything to negotiate. (*Id.* 118A-119A.) Under these circumstances, it is clear that Tristani and Valenta failed to avail themselves of the predeprivation procedures available to them because of their own failure to recognize the DPW's liens as illegal.

Because Tristani and Valenta made their payments to the DPW before the issuance of the Supreme Court's decision in *Ahlborn*, they saw no need to use Pennsylvania's judicial system for

the purpose of challenging the validity of the DPW's liens. That does not mean that the judicial system was somehow unavailable for this purpose, or that Pennsylvania's collection *procedures* were otherwise infirm. Accordingly, Tristani and Valenta cannot establish violations of the Due Process Clause, and Richman and Houstoun are entitled to summary judgment with respect to the procedural due process claims asserted against them.

## 2.     The Claims Arising Under Pennsylvania Law

Tristani and Valenta assert claims arising under Pennsylvania law. First, they assert claims pursuant to section 1409(b)(7). Second, they assert claims under the Takings Clause of article I, section 10, of the Pennsylvania Constitution. (*Id.*) These claims can be disposed of without extended analysis. While the DPW's actions violated §§ 1396p(a)(1) and 1396p(b)(1), they were clearly not contrary to section 1409(b)(7). In fact, they were purportedly *authorized* by section 1409(b)(7). The court does not understand how Tristani and Valenta can pursue causes of action under Pennsylvania law pursuant to the very statute that *they* believe to have been unconstitutionally applied to their settlement awards.

The existence of an overriding federal claim does not operate to breath life into an otherwise nonexistent state cause of action. With respect to the Takings Clause of the Pennsylvania Constitution, the Pennsylvania courts have consistently construed that provision to be coextensive with its federal counterpart. *Machipongo Land & Coal Co., Inc. v. Dep't of Envtl. Prot.*, 799 A.2d 751, 763 n.7 (Pa. 2002). The court already concluded that no violation of the Fifth Amendment's Takings Clause can be established in this case. Tristani and Valenta do not argue that the Pennsylvania Constitution's Takings Clause provides broader protection than its federal counterpart under the present circumstances. Since they fail to make such an

argument, the court's resolution of their federal Takings Clause claims is dispositive of plaintiff's constitutional Takings Clause claims. *Smolow v. Hafer*, 959 A.2d 298, 300 n.6 (Pa. 2008). Tristani and Valenta cannot establish violations of Pennsylvania law, and summary judgment must be entered in favor of Richman and Houstoun with respect to any claims arising thereunder.

## F.    Qualified Immunity

Although the language of § 1983 speaks of no immunities, the Supreme Court has always assumed that Congress would have expressly made common-law immunities inapplicable to § 1983 actions within the statutory text if it had intended to do so. *Pierson v. Ray*, 386 U.S. 547, 554-55 (1967). For this reason, the "qualified immunity" that was available to state officials at common law is available to defendants such as Richman and Houstoun. *Kalina v. Fletcher*, 522 U.S. 118, 131-35 (1997) (Scalia, J., concurring). As a general matter, state officials performing discretionary duties are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). State officials can be on notice that their conduct violates clearly established federal law even under novel factual circumstances. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This is because "general statements of law are not inherently incapable of giving fair and clear warning." *United States v. Lanier*, 520 U.S. 259, 271 (1997).

In order for a federally protected right to be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S.

635, 640 (1987). Qualified immunity is not merely a defense to liability, but "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Consequently, the Supreme Court has often stressed the importance of resolving qualified immunity issues at the earliest possible stage in litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

The Supreme Court has recognized that a court evaluating a defendant's claim of qualified immunity will often find it beneficial to first decide whether the plaintiff can establish an actionable violation of a federally protected right. *Pearson*, 129 S. Ct. at 818, 821-22. The court has already determined that the DPW violated §§ 1396p(a)(1) and 1396p(b)(1) by imposing and satisfying its liens on the settlement awards obtained by Tristani and Valenta. The next question for consideration is whether the rights enjoyed by Tristani and Valenta under those provisions were clearly established at the time of the violations. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. The critical question is whether it would have been clear to reasonable officials in the position of Richman and Houstoun that their conduct was unlawful under the particular circumstances that they confronted. *Id.* at 202. The standard is objective, viewing the relevant circumstances from the perspective of an objectively reasonable official. *Showers v. Spangler*, 182 F.3d 165, 171-72 (3d Cir. 1999). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Richman succeeded Houstoun as the Secretary of Public Welfare on March 11, 2003. Governor's Cabinet Officials, online at http://www.governor.state.pa.us (as visited November 26,

90

2008).  Therefore, every act committed by Houstoun occurred prior to that date.  All the actions

taken by the DPW concerning Tristani and Valenta occurred prior to the issuance of the Supreme

Court's decision in *Ahlborn* on May 1, 2006.  Prior to that date, the law concerning the

application of Title XIX's anti-lien and anti-recovery provisions was not clearly established.

Indeed, the precise nature of the violations found in this case (i.e., violations based on the

assignment provisions of Title XIX not being exceptions to the anti-lien and anti-recovery

provisions) were not clearly identified until today.  Under these circumstances, it cannot be said

that the actions taken by Richman and Houstoun with respect to Tristani and Valenta (or with

respect to any other Medicaid recipients during the relevant period of time) were objectively

unreasonable.  Consequently, Richman and Houstoun are entitled to qualified immunity to the

extent that it is available with respect to the claims under §§ 1396p(a)(1) and 1396p(b)(1).

   Tristani and Valenta argue that the actions taken by Richman and Houstoun were

"ministerial" rather than "discretionary," thereby precluding the availability of qualified

immunity as a defense.  The court is unpersuaded by this argument.  In *Davis v. Scherer*, 468

U.S. 183, 196 n.14 (1984), the Supreme Court observed that "[a] law that fails to specify the

precise action that [an] official must take in each instance creates only discretionary authority,"

and that such authority "remains discretionary however egregiously it is abused."  More recently,

in *Eddy v. Virgin Islands Water & Power Authority*, 256 F.3d 204 (3d Cir. 2001), the United

States Court of Appeals for the Third Circuit stated that "the definition of a discretionary

function is broad."  *Eddy*, 256 F.3d at 210.  There is some doubt about whether the "ministerial

duty exception" to qualified immunity remains viable.  *Varrone v. Bilotti*, 123 F.3d 75, 82 (2d

Cir. 1997).  Even if it is assumed that the exception is still viable, it is clear that it is "extremely

narrow in scope." *Gagne v. City of Galveston*, 805 F.2d 558, 560 (5th Cir. 1986). Whatever the scope of the exception may be, it is not broad enough to encompass the actions taken by Richman and Houstoun in relation to Medicaid recipients such as Tristani and Valenta.

As discussed earlier, a state can satisfy its obligations under § 1396a(a)(25)(A)-(B) by pursuing direct actions against liable third parties. This option was available to the DPW under Pennsylvania law. 62 Pa. Stat. Ann. § 1409(b)(1). A state's obligations under § 1396a(a)(25)(A)-(B) can also be satisfied by the state's intervention in an action brought by a Medicaid beneficiary against a liable third party. That option was likewise available to the DPW under Pennsylvania law. 62 Pa. Stat. Ann. § 1409(b)(5). Tristani and Valenta base their entire case on the idea that the DPW was not only *permitted* to choose one of these two options, but that it was essentially *required* to do so because §§ 1396p(a)(1) and 1396p(b)(1) precluded it from choosing the post-settlement lien and recovery option. Given the availability of these alternative options, it cannot be said that Richman or Houstoun had a "ministerial duty" to impose liens on the settlement awards obtained by Tristani and Valenta. The relevant actions taken by Richman and Houstoun were clearly "discretionary" for purposes of qualified immunity.

Tristani and Valenta make the alternative argument that qualified immunity is not available in this case because the relief that they seek is equitable rather than legal. Relying on the decision of the United States District Court for the Western District of Missouri in *Doran v. Missouri Dept. of Social Services*, Civil Action No. 07-4158, 2008 U.S. Dist. LEXIS 1418, at **12-13 (W.D. Mo. Jan. 8, 2008), they claim that the relief that they seek (i.e., the return of the $148,508.99 paid by Tristani and the $10,000.00 paid by Valenta) is more properly characterized as a form of equitable restitution than as a monetary remedy. This argument is unavailing.

92

Several courts have stated, in general terms, that qualified immunity "does not shield a defendant from claims for equitable relief." *Hopkins v. Saunders*, 199 F.3d 968, 977 (8th Cir. 1999). Such statements have usually been made, however, with the understanding that equitable relief under § 1983 is typically sought only against an individual in his or her official capacity. *Brown v. Bathke*, 566 F.2d 588, 593 (8th Cir. 1977). A state official sued in his or her official capacity is not a "person" for purposes of § 1983 where the relief sought is monetary damages, since the Supreme Court has not construed § 1983 as an abrogation of the states' Eleventh Amendment immunity. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 63-71 (1989). In contrast, where a plaintiff seeks injunctive relief against a state official in his or her official capacity, the suit is not treated as an action against the state, and the state official is a "person" within the meaning of § 1983. *Id.* at 71 n.10.

The Eleventh Amendment does not bar official-capacity suits for prospective relief against state officials under *Ex Parte Young*, 209 U.S. 123 (1908). *Bd. of Trs. v. Garrett*, 531 U.S. 356, 374 n.9 (2001). As the parties all appear to recognize, the Eleventh Amendment would bar an action against the DPW (or an official-capacity action against Richman) seeking the return of the money in question regardless whether the requested relief is properly characterized as legal or equitable. *Edelman v. Jordan*, 415 U.S. 651, 663-69 (1974). A state official sued in his or her individual capacity is a "person" for purposes of § 1983, and the Eleventh Amendment does not shield such an official from personal liability for money damages. *Hafer v. Melo*, 502 U.S. 21, 22-31 (1991). A state official sued in his or her individual capacity can avail himself or herself of the defense of qualified immunity, which would not be available to him or her in an official-capacity suit brought pursuant to *Ex Parte Young*. *Kentucky v. Graham*, 473 U.S. 159, 166-67

(1985).  Tristani and Valenta apparently believe that they can circumvent *both* the Eleventh Amendment (which bars them from obtaining retroactive monetary payments from the DPW, or from Richman in her official capacity) *and* qualified immunity (which they believe to be inapplicable to claims for "equitable restitution") by asserting "equitable restitution" claims against Richman and Houstoun in their *individual* capacities.

While the court understands the position taken by Tristani and Valenta to be the product of reasoned analysis, that position is untenable.  Qualified immunity exists so that the discretionary decisions made by state officials are not influenced by fears of personal liability for monetary damages.  *Acierno v. Cloutier*, 40 F.3d 597, 608 (3d Cir. 1994).  The applicability of qualified immunity turns on whether the imposition of the relief sought against a particular defendant implicates that interest, not on whether the relief itself is properly characterized as "legal" or "equitable."  For this reason, some courts have held that state officials sued in their individual capacities can avail themselves of qualified immunity where judgments against them would require them to pay money out of their own pockets, regardless how the plaintiffs have characterized the requested forms of relief.  *Kirby v. City of Elizabeth City*, 388 F.3d 440, 452 n.10 (4th Cir. 2004); *Fred v. Roque*, 916 F.2d 37, 38 n.2 (1st Cir. 1990).  As the United States Court of Appeals for the Ninth Circuit observed in *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1472 n.1 (9th Cir. 1993), "the policies underlying the qualified immunity doctrine in the damages context" applies "with equal force" where a judgment in favor of a plaintiff would require the defendant to pay a sum of money from his or her personal funds.  Tristani and Valenta make it clear that their "restitution claims" are asserted against Richman and Houstoun in their individual capacities.  An award of damages stemming from such claims could

be executed only against the *personal* assets of Richman and Houstoun. *Graham*, 473 U.S. at 166. Consequently, Richman and Houstoun are entitled to qualified immunity under these circumstances.

The argument made by Tristani and Valenta lacks merit for another reason. They acknowledge that the DPW has the money that it collected from their settlement awards. That money was not deposited into the personal accounts of Richman and Houstoun. Since the money that Tristani and Valenta seek is in the possession of the DPW, an action seeking its return could only exist against Richman in her official capacity. *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993); *Weigand v. Spadt*, 317 F.Supp.2d 1129, 1142 n.11 (D. Neb. 2004). Such an action, of course, would be barred by the Eleventh Amendment. *Will*, 491 U.S. at 65-71. An individual-capacity award of restitution against Richman or Houstoun cannot be properly characterized as an "equitable remedy." *Los Angeles Police Prot. League*, 995 F.2d at 1472 n.1. In this individual-capacity context, the term "equitable restitution" is a misnomer. *Figueroa-Rodriguez v. Aquino*, 863 F.2d 1037, 1043, n. 7 (1st Cir. 1988). Richman and Houstoun cannot be expected primarily to hand over property that they never received. Richman and Houstoun are shielded by qualified immunity from the claims for monetary relief asserted against them, regardless how such claims are characterized by Tristani and Valenta.

## G.    Remaining Issues

The court acknowledges that outstanding issues remain concerning whether Tristani and Valenta have standing to seek injunctive and declaratory relief, whether they have standing to represent a proposed class of Medicaid beneficiaries subject to illegal "liens" and "recoveries," and whether other potential class representatives can be substituted for them if it is determined

that they lack the requisite standing to represent a proposed class.  Tristani and Valenta advise

that the parties agreed to postpone the resolution of these issues until after the adjudication of the

merits of their claims.  (Docket No. 83 at 2, 6.)  While Richman and Houstoun may disagree with

this characterization of the parties' understanding, the court, without robust briefing by the

parties,  is disinclined to address these outstanding issues at this time.  The court determined

whether summary judgment should be granted with respect to the individual claims for monetary

damage asserted in this case because Tristani and Valenta have standing to sue for monetary

damages, and because the court found it appropriate to consider the merits of their individual

claims before addressing the issue of qualified immunity.  *Pearson*, 129 S. Ct. at 818, 821-22;

*Saucier*, 533 U.S. at 200-01.  The questions concerning the standing of Tristani and Valenta to

seek declaratory or injunctive relief in their own right or as representatives of a proposed class

will be more appropriately dealt with at the class certification stage.  Proceeding in this fashion

will alleviate any prejudice to the parties potentially resulting from the premature determination

of issues not properly briefed at the present time.


### *Conclusion*

The plain language of §§ 1396p(a)(1) and 1396p(b)(1) precludes the "liens" and

"recoveries" challenged in this case.  The application of section 1409(b)(7)(i), which authorized

the DPW to impose such liens and obtain such recoveries, was unconstitutional under the

Supremacy Clause.  Richman and Houstoun are entitled to qualified immunity due to the law

concerning these issues being not clearly established at the time of the discretionary actions in

question.  Tristani and Valenta cannot establish violations of § 1396k(b), the Takings Clause of

the Fifth Amendment, or the Due Process Clause of the Fourteenth Amendment, nor can they establish actionable violations of Pennsylvania law. Accordingly, the motion for summary judgment filed by Richman and Houstoun will be granted except insofar as it seeks a determination that Tristani and Valenta lack standing to seek declaratory or injunctive relief either on their own behalf or on behalf of a proposed class. The motion will be denied as to those issues without prejudice, since those issues will be dealt with at a later stage. The motion for partial summary judgment filed by Tristani and Valenta will be denied.

AND NOW, this 25th day of March, 2009, upon consideration of the cross-motions for summary judgment filed by defendants Estelle B. Richman and Feather Houstoun (Docket No. 64) and by plaintiffs Rita L. Tristani and Joshua C. Valenta (Docket No. 68), **IT IS HEREBY ORDERED** that the defendants' motion for summary judgment is **GRANTED** except with respect to whether the named plaintiffs have standing to seek declaratory or injunctive relief, either on their own behalf or on behalf of a proposed class, and that the plaintiffs' motion for partial summary judgment is **DENIED**.

By the court:

_/s/ Joy Flowers Conti_
Joy Flowers Conti
United States District Judge